UNITED STATES of America, Plaintiff,

v.

James G. CLARK, Jr., Sheriff of Dallas County, Blanchard McLeod, Circuit Solicitor for the Fourth Judicial Circuit, State of Alabama, James Hare, Judge for the Fourth Judicial Circuit, State of Alabama, Bernard Reynolds, Judge of Probate of Dallas County, Alabama, and City of Selma, Alabama, Defendants.

Civ. A. No. 3438-64.

United States District Court
S. D. Alabama, N. D.

April 16, 1965.

John Doar, Asst. Atty. Gen., Washington, D. C., V. R. Jansen, Jr., U. S. Atty., Mobile, Ala., for plaintiff.

McLean Pitts, Pitts & Pitts, J. E. Wilkinson, Jr., Thomas G. Gayle, Royal Randolph Smith, Selma, Ala., for defendants.

Before RIVES, Circuit Judge, and THOMAS and JOHNSON, District Judges.

PER CURIAM.

This action is brought by the United States pursuant to Section 206(a) of the Civil Rights Act of 1964 (78 Stat. 241) and 42 U.S.C. § 1971, to obtain preventive relief against acts and practices of the defendant City of Selma, Alabama, and the defendant public officials of Dallas County, Alabama. This action, having been commenced under Section 206 of the Civil Rights Act of 1964, and the Attorney General of the United States having filed a request therefor, the Chief Judge of the United States Court of Appeals constituted a three-judge court to hear and determine the matter.

The defendant City of Selma is an incorporated municipality and is the county seat of Dallas County, Alabama. The defendant James G. Clark, Jr., is the Sheriff of Dallas County, Alabama, and as such is authorized and charged with the duty of enforcing the law within Dallas County. Blanchard McLeod is the Circuit Solicitor for the Fourth Judicial Circuit, which includes Dallas County; as such, he is authorized and charged with the duty of prosecuting violations of the laws of Alabama occurring in Dallas County. James Hare is the Circuit Judge for the Fourth Judicial Circuit and as such has jurisdiction in Dallas County. Bernard A. Reynolds is the Judge of Probate of Dallas County and as such, among other things, has jurisdiction over juveniles accused of violating the penal laws, and also has jurisdiction in cases where adults are charged with contributing to the delinquency of minors.

The United States contends that the defendants have engaged in acts and practices having the purpose and effect of threatening, intimidating and coercing Negro citizens so as to interfere with the rights of Negroes to register to vote and to use public accommodations on an equal basis with white persons. The United States asks this Court for a declaration and injunction against defendants' interference with these rights. More specifically, the United States requests this Court to enjoin said defendants from:

(a) Arresting, detaining under unreasonable bail, prosecuting, convicting, punishing, or threatening to arrest, detain, prosecute, convict or punish discriminatorily and without just cause any person who is known by defendants to be exercising, seeking to exercise, or to have exercised his right to vote or to use public accommodations free from racial discrimination;

(b) Requesting, issuing, enforcing, or threatening to enforce any injunction that prevents persons from effectively organizing, meeting or assembling to discuss or advocate the exercise of said rights;

(c) Using unreasonable force or threatening without just cause to use force, in the performance of law enforcement functions, against persons known to the defendants to be exercising, seeking to exercise or to have exercised the aforesaid rights;

(d) Failing to provide ordinary police protection to persons attempting peaceably to exercise said rights;

(e) Intimidating, threatening or coercing, by any of the means described in subparagraphs (a) through (d) or by any other means, any person whatever for the purpose of preventing, interfering with or discouraging Negroes from voting or registering to vote or from using public accommodations without regard to race or color.

The United States also seeks to have set aside all convictions and to have reimbursement made for all fines paid where said convictions and fines were imposed illegally and discriminatorily upon individuals exercising or seeking to exercise their right to register to vote or to use public accommodations free from racial discrimination. It is further requested that this Court enjoin the defendants from enforcing or giving effect to a State court injunction issued by Judge Hare of the Fourth Judicial Circuit of Alabama on July 9, 1964.

Each of the defendants (assigning numerous grounds) asks dismissal of the action. By formal order, this Court withheld ruling on these motions until the case could be heard on its merits.

The case was heard, this Court sitting in the Northern Division for the Southern District of Alabama, in December 1964, and the evidence consisting of testimony from over 125 witnesses and of approximately 100 exhibits. The matter is now submitted upon the pleadings, the motions of the defendants, the evidence, and the briefs and arguments of the parties. Upon this submission, this Court now proceeds to make the appropriate findings of fact and conclusions of law, and, as authorized by Rule 52, Federal Rules of Civil Procedure, incorporates said findings and conclusions in this memorandum opinion.

Under Alabama law, registration is a prerequisite to voting in any election. In several counties in central Alabama, including Dallas County, fewer than 10% of the Negroes of voting age are registered to vote.[1] In Dallas County, as of November 1964, only 2.2% of the Negroes of voting age were registered.[2] For the purpose of attempting to obtain better political representation for Negro citizens in Dallas County, the Negro community established in May 1963 the Dallas County Voters League. Mass meetings were held weekly, with Dallas County deputy sheriffs, under the direction of Sheriff Clark, attending all such meetings that the sheriff knew about. Very little, if any, progress in the registration of Negroes was made; and in September or October, 1963, after mass arrests of peacefully demonstrating Negroes by the City of Selma officials and the sheriff and his deputies,[3] one or more of the national organizations that have for their avowed purpose the securing of equal rights for Negroes, actively entered upon the Dallas County, and particularly the Selma, Alabama, scene. During the remainder of 1963, there were several mass meetings, demonstrations, and occasional picketing by the Negroes; the attempts to register to vote continued and the arrests by the county authorities continued. During the first six months of 1964, there was little organized Negro activity in Selma and Dallas County other than the weekly mass meetings, which

1. See the Court's findings in Williams, et al. v. Wallace, et al., D.C.M.D.Ala., 240 F.Supp. 100.

2. See Appendix "A".

3. During the period from September 16 through October 4, 1963, approximately 256 Negro juveniles were arrested. The warrants of arrest show they were charged with one or more of the following offenses: Unlawful assembly, parading without a permit, picketing (by demonstrating on a sidewalk, spaced less than ten feet apart), truancy and trespass after warning. These juveniles so arrested and charged ranged in age from 6 to 21, and the majority of them spent from one to eight days in jail before their cases were disposed of. These juveniles, for the most part, were questioned intensively by Probate Judge Reynolds as to their "civil rights" activities. Some of them were placed on probation, with warnings as to other such future activities, such as attending the mass meetings and picketing the county courthouse.

were generally held in the Negro churches. These meetings were covered by both State of Alabama and Dallas County officials. Speeches at these meetings centered on voter registration. An adult literacy project for the Negroes was instituted, "freedom day" programs— where a special effort was made to get unregistered Negroes registered to vote —were organized and conducted. The Dallas County Board of Registrars during this period processed only 20 to 30 applications per day. The Negro community of Dallas County and particularly Selma, Alabama, had accomplished very little by their activities up to the beginning of the summer of 1964.

On July 2, 1964, the Civil Rights Act of 1964 (P.L. 88–352) became law. Among other things, this law contained specific provisions to secure the rights of Negro citizens in their use of places of public accommodation and in their attempts to register to vote.[4] Arrangements were made by a large number of the Negroes of Selma and Dallas County to test their new rights. At this time the Police Department of the City of Selma, Alabama, consisted of approximately 40 officers. The Sheriff's Department in Dallas County had 8 regular deputies and approximately 200 "possemen." The posse had been organized some several years earlier by Sheriff Clark for the stated purpose of assisting in periods of emergency and disaster, such as floods; the posse organization was, and is, composed of all-white male Dallas Countians who are nonprofessionals in the field of law enforcement. The sheriff has no voice in appointing members or officers of the posse; however, he reserves the right to turn down applicants. The posse members carry side arms and clubs; some are horse mounted and occasionally are armed with canisters of gas. Under the leadership and the specific directions of Sheriff Clark, the posse has been active in Dallas County, and particularly in Selma, Alabama, as a major instrument in dealing with racial matters. The posse had been used not only in Dallas County,

but in Birmingham, Tuskegee and Tuscaloosa in connection with racial incidents in those Alabama cities.

The City of Selma, charged with the responsibility of enforcing all penal laws within the City (Title 37, Section 9, Code of Alabama), had made arrangements with Sheriff Clark prior to the summer of 1964, to let the Sheriff's Office take the lead in handling all racial matters in Selma, Alabama.

About 3:00 p. m., on July 4, 1964, four Negro college students (two male and two female), who were in Selma in connection with the literacy project, attempted to obtain service at the Thirsty Boy Drive-In. The owner called Sheriff Clark, although his normal practice was to call the city police. The sheriff and several deputies arrived. A form affidavit was handed to the proprietor to sign; the warrants charging trespass after warning were already partially completed. The four Negro students were arrested, and electric cattle prods were used on at least one, and possibly two, of them by Sheriff Clark; one of the students had an additional charge of resisting arrest lodged against him when he responded to the electrical shocks; another had placed against her an additional charge of carrying a concealed weapon— a bicycle chain and padlock. All four of these Negro students were required to answer a two-page questionnaire about their civil rights activities. All were lodged in jail.

Later on July 4 between 4:00 and 5:00 p. m., ten to fifteen Negro teen-agers, after purchasing tickets and securing permission of the management, entered the formerly white section of Selma's Wilby Theatre; this was the first time an attempt had been made to desegregate the theatre. At the time of this occurrence, city police, deputy sheriffs and "possemen" patrolled the theatre area; around 5:30 p. m., when additional Negroes attempted to enter the theatre, they were blocked by a group of white citizens; an altercation occurred, and when

4. See Appendix "B".

police were summoned by the management, the police, deputies, the sheriff and "possemen" responded; both white and Negro groups on the outside of the theatre were dispersed. Several unknown white citizens entered the theatre to remove the Negroes; the manager advised the Negroes to leave—they did; at this time some of the sheriff's deputies were inside the theatre. The officers—police, sheriff and possemen—did nothing on this occasion to protect the Negroes in their use or attempted use of this place of public accommodation; instead, they chased them from the theatre entrance and stood by while the whites forced them from the inside. The theatre was closed for the day upon the order of Sheriff Clark. Tension in Selma on this July 4 was high, and certain other isolated instances, such as bottle and rock throwing at automobiles by Negroes, reflected the general situation. For instance, about 10:00 p. m., on July 4, on Broad Street in front of Clay's Casino, a car occupied by a white family was hit by a coca-cola bottle thrown by an unknown person among a crowd of Negroes. The bottle broke the right rear window of the car and injured three of the occupants. No whites were arrested; one Negro man, while standing near a cafe for Negroes, was clubbed by a "posseman" and hospitalized.

On the night of July 5, a Negro mass meeting was held on Green Street in Selma, and the sheriff sent 50 to 65 possemen to the scene. As the meeting ended and the Negroes were moving from the hall, someone threw a rock at the line of "possemen." The possemen responded immediately, moving into the crowd of Negroes with night sticks; tear gas was also used on the crowd. Two white newsmen who were known to the solicitor and the sheriff's deputies were beaten and their photographic equipment destroyed or rendered useless by the posse members; Negroes were clubbed—in one instance at least a block and a half from the meeting hall—and some were hospitalized; Negroes living nearby had windows broken from their homes; porch lights were either turned out or knocked out, and all Negroes were ordered off the streets. Sheriff Clark and Solicitor McLeod were also on the scene. No medical attention was given or offered the newsmen; instead, they were advised by Solicitor McLeod to leave Selma immediately.

The Dallas County Board of Registrars met from July 6 through July 10; Sheriff Clark stationed as many as 15 to 20 deputies and possemen in the neighborhood of the courthouse (where the registrars were located) throughout this period. Applicants were allowed to use only one door of the courthouse and then after walking past the line of lawmen. Possemen guarded the other courthouse entrances.

On July 6, upon the picketing of the county courthouse by three young Negroes with signs urging persons to register to vote, Sheriff Clark ordered the mass arrests of all Negroes in the area. Some of those arrested were standing on the United States courthouse steps; others were in the area just attending to their usual business, and still others were curious bystanders. Upon this same occasion, a United Press International newsman was shoved from a nearby telephone booth by a sheriff's deputy as he attempted to report the story of the mass arrests. Fifty-three persons were arrested, twelve of whom were juveniles; all were jailed; none was charged in writing with any offense at the time of arrest, but a day or so later predated warrants were made out charging them with interfering with a court in session.[5] City Policeman Thomas Py-

5. The City of Selma adopted an ordinance on October 14, 1963, as follows:
   "AN ORDINANCE ENTITLED 'AN ORDINANCE TO PROHIBIT INTERFERENCE WITH COURTS.' "
   "BE IT ORDAINED by the City Council of the City of Selma, Alabama, as fol-

lows: whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer in the discharge of his duty, pickets or parades in or near a building in the City of Selma housing a court of the State of Alabama, or Dallas

ron's rubber stamped signature was used in the place designated for the signature of the issuing officer. Pyron had no knowledge of the preparation or issuance of the warrants. Bonds were set for most in excess of the $300 allowed by law. Still later, additional warrants were made out, charging some 40 of the adults arrested with contributing to the delinquency of a minor—Claude Nelson. Some of these adults so charged did not even know the minor Nelson. No investigation was made by the Sheriff's Office as to the charges, but completed questionnaires were obtained from those arrested concerning their civil rights activities. These cases, along with many others of a similar nature, were removed to the United States District Court for the Southern District of Alabama, where they have been disposed of by appropriate order in Civil Action No. 3385 prior to the filing of this opinion.

Contrasted with this action against the Negroes, on the same day, July 6, Sheriff Clark arrested six white men from Perry County, Alabama; several bats and clubs and a rubber hose were found in their car; a Ku Klux Klan shoulder patch was also found in the car; the charges of carrying concealed weapons were later nol-prossed by Solicitor McLeod.

The arrests of Negro pickets holding voter registration signs (some still on Federal property across the street from the Dallas County Courthouse) continued through the week up to and including July 9.

Circuit Judge James Hare issued an injunction on July 9[6] against some 47 individuals, most of them Negroes, and 15 organizations, many of them active in behalf of the Negroes' civil rights movement, and the Ku Klux Klan, National States Rights Party, et al. Among other things, the injunction bars all of them from gatherings of three or more persons on a public street or in a public place. The basis for the injunction was a complaint—verified by Sheriff Clark and supported by a number of affidavits which were exhibited to Judge Hare, but not filed. Sixteen local Negro ministers were among the defendants named by the injunction; twelve of the defendants were in jail at the time of the issuance. The injunction was removed to the Unit-

---

County, or City of Selma, or in or near a building or residence occupied or used by such judge, juror, witness, or court officer in the City of Selma, or with such intent uses any soundtruck or similar device or resorts to any other demonstration in or near any such building or residence, shall be fined not more than $100.00 or imprisoned not more than 180 days, or both.

"Nothing in this ordinance shall interfere with or prevent the exercise by any court of the State of Alabama, or Dallas County, or City of Selma, of its power to punish for contempt."

6. The text of the injunction is as follows:

NOW, THEREFORE, you, and each of you, your agents, servants or employees, or any person who may act in concert or participation with you, are enjoined from the following:

1. From any assembly of three persons or more in a public place.

a. From engaging in meetings or any other activities whereby violation of law is suggested, advocated or encouraged; or engaged in meetings whereby the public ways, streets, sidewalks or highways of the City of Selma, Dallas County, Alabama, are blocked or the unimpaired use thereof denied to other traffic and citizens.

3. From encouraging or engaging in meetings or any other activities designed or held for the purpose of impeding or obstruction or obstructing the administration of justice or the orderly function of government.

4. From encouraging or engaging in any activities designed to, or which do, impede, hinder, or obstruct officers of the law, or officials of Dallas County, Alabama, or officials of the City of Selma, Alabama, from performing and discharging the duties of their respective office.

5. From assembling anywhere on a public street three or more persons.

6. From committing any acts, things or deeds against any law enforcement officers of the City of Selma, Alabama, or any law enforcement officers of Dallas County, Alabama.

until the further orders and decrees of this Court; this you will in no wise omit under penalty of law.

ed States District Court for the Southern District of Alabama on July 13, and was dissolved by said Court on April 16th, 1965. (Civil Action No. 3388–64) Attempts were made by Sheriff Clark, Solicitor McLeod and Judge Hare to obtain compliance with the injunction even after its removal to the Federal court. For instance, Sheriff Clark arranged a meeting—attended by Judge Hare and Solicitor McLeod—with the top officials of nearby Craig Air Force Base to discuss the terms of the injunction and its observance by air force personnel; this meeting and discussion was held and conducted on July 27 or 28, 1964.

▆▆▆▆ The law is clear that there can be no coercion or punishment of any person for the purpose of interfering with the right to nondiscriminatory treatment in a place of public accommodation or in the right to vote in Federal elections. It is also clear that theatres and certain restaurants, such as the Thirsty Boy, are places of public accommodation within the meaning of Section 201(a) of the Civil Rights Act of 1964. Section 203 of that Act prohibits interference or attempts to interfere with the right of any citizen to obtain service in such places.[7] Furthermore, it is basic that the right of qualified Negroes to register to vote is guaranteed by the Fifteenth Amendment to the Constitution of the United States, and, under Title 42 U.S.C. § 1971(b) any intimidation or attempts to intimidate any person for the purpose of interfering with this right to register to vote is prohibited.[8]

In order to assist, if necessary, in the guaranty of these rights, the United States is authorized by Section 206(a) of the Civil Rights Act of 1964 to sue for the purpose of seeking an injunction against interference with both the right to vote and interference with the rights of citizens to use places of public accommodation.[9]

▆▆▆▆ The argument is advanced on behalf of the defendants Judge Hare, Solicitor McLeod, and Judge Reynolds, that they, as judicial officers, may not be enjoined; this argument is based upon the theory that they are immune from suit on matters growing out of their judicial acts, notwithstanding the fact that their conduct may have exceeded their jurisdiction. This doctrine of "judicial immunity" is a sound one and ingrained in the substantive law of both the Federal and State courts. Norton, et al. v. McShane (5th Cir. 1964), 332 F.2d 855, and the several cases cited therein; Zellner v. George Wallace, MD Ala.1964, 233 F. Supp. 874. The Federal courts have applied it to numerous Federal officials.[10] *However, such a doctrine of judicial immunity applies only when those officials are faced with civil suits for damages in connection with the performance of their official duties.* The doctrine has no application where, as here, the relief sought is preventive. In this connection, it is well established that the United States, suing under a Federal statute conferring mandatory jurisdiction on a Federal court, is entitled—if the evidence warrants it—to injunctive relief against State and local officials. United States v. Wood, 295 F.2d 772, (5th Cir. 1961), cert. denied 369 U.S. 850, 82 S.Ct. 933, 8 L.Ed.2d 9. This includes sheriffs, prosecutors and all others, whether they be judges or governors, who may participate in a scheme or engage in a pattern of conduct designed to deprive citizens of their constitutional rights. The principle that no State official—regardless of his position—is immune from having his conduct challenged—in the form of a preventive action—is well established. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5; Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632; Sterling v. Constantin,

---

7. These sections are set out in Appendix "B".

8. Set out in Appendix "B".

9. See Appendix "B".

10. Some of these cases are Cooper v. O'Connor, 69 App.D.C. 100, 99 F.2d 135; Laughlin v. Garnett, 78 U.S.App.D.C. 194, 138 F.2d 931, and Swanson v. Willis, D.C., 114 F.Supp. 434.

287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375; Bush v. Orleans Parish School Board (E.D.La., 1960), 187 F.Supp. 42, aff'd 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806; In re Wallace (M.D.Ala., 1959), 170 F.Supp. 63.

■ Since 42 U.S.C. § 1971 and Title II of the 1964 Act confer mandatory jurisdiction upon this Court and there is no immunity from a preventive relief suit such as this one, the assertions on behalf of the defendants, Judge Hare, Solicitor McLeod, Sheriff Clark and Judge Reynolds, are without merit. Such an action involves no interference with judicial discretion since an injunction—if warranted by the evidence and if issued—will only prevent the doing of what there is no right to do. Ex parte Young, 209 U.S. 123, 159, 28 S.Ct. 441, 52 L.Ed. 714.

■ Proceeding now with an application of the appropriate legal principles to this case, it should be noted that under both Title II of the Civil Rights Act of 1964 and 43 U.S.C. § 1971, when measuring conduct that is alleged to be for the purpose of defeating Negroes in the exercise of their rights as guaranteed by these statutes, it is unlawful for any person: (1) to intimidate, threaten, or coerce, or attempt to do any one of these things, (2) for the purpose of interfering with a right to vote or the right to nondiscriminatory treatment in places of public accommodation. In looking at the questioned conduct of the defendants in this case, it is necessary and appropriate to consider the case as a whole, "weighing all of the evidence and rational inferences * * *." Meredith v. Fair, 305 F.2d 343, 360 (5th Cir. 1962), cert. denied 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed.2d 66. In this connection, this Court is not blind to the effect of baseless arrests, unjustified prosecutions, unwarranted and illegal injunctions, and any other acts or conduct—official or otherwise, but particularly official—upon individuals so subjected who are legally seeking to exercise their rights.

The inevitable effect of such acts and conduct is to severely discourage, intimidate, threaten and coerce those citizens who are seeking or might otherwise seek to exercise the rights involved. This is precisely the type of conduct proscribed by Title II and Section 1971(b). The success or failure of intimidation, threats or coercion, is immaterial, since "attempts" are equally proscribed.

■ In measuring the conduct of the defendant Sheriff Clark by these applicable standards, the evidence is overwhelming that Clark, acting individually and also through his regular deputies and the members of the "posse", has demonstrated a clear purpose to interfere with the right of Negro citizens to use places of public accommodations, and to register to vote or to protest discrimination in these areas; such pattern and practice of conduct on the part of Sheriff Clark, and his regular deputies and "posse", had the effect of being highly intimidatory and coercive. There is no question that the purpose of Sheriff Clark's personal actions and conduct, and also that of his agents, as herein found, was to suppress efforts by Negroes to exercise their lawful and constitutional rights. Such future conduct on the part of Sheriff Clark, his deputies and the members of the posse must be appropriately prevented.

■ As to the Dallas County posse and the individual members thereof, the evidence is clear that the sheriff used this group as one of his major coercive instruments in the interference with Negro rights. The real present purpose of the posse is shown by its use and the action of its members not only in Selma, but outside Dallas County when it was utilized in connection with other Alabama racial disturbances—in Birmingham, Tuscaloosa and Tuskegee.[11] As noted above, Sheriff Clark has, according to the evidence in this case, no voice in appointing members or officers of this posse. Such a posse is illegal, even ac-

11. In this connection, see the discussion and findings concerning the Dallas Coun-

ty posse and its use, in Williams v. Wallace, D.C.M.D.Ala., 240 F.Supp. 100.

cording to the law of Alabama. The old case of Perkins & Hopkins v. Reed, 14 Ala. 536, sets down the rule concerning the appointment of personnel to aid a sheriff. In that case the court said: "The sheriff, who himself holds an office under delegation from the people, cannot confer upon a third person the authority to depute one or more persons to act for him  *  *  *  If he requires assistants to enable him to discharge his office, or chooses to employ them, he must himself select them, and cannot devolve upon others the performance of this duty." See also the case of Schloss v. Hewlett, 81 Ala. 266, 1 So. 263, which followed this rule.

■ This Court recognizes that in Alabama the sheriff is the chief conservator of the peace and "in the execution of this duty he may summon to his aid as many of the men of his county as he thinks proper,  *  *  *." Title 15, Section 398, Code of Alabama; however, the Dallas County posse as it is presently constituted is illegal, and its further use, as presently constituted, in any racial matters must be enjoined. If and when a new posse or group of "men of his county" are summoned by the sheriff of Dallas County, its use insofar as racial matters are concerned will be subject to this Court's injunctive orders; any such new "posse" or group of "men of his county" summoned by the sheriff must be, as to both membership and activity, under the exclusive control of the sheriff; the membership must be constituted in such a way as to insure the impartial enforcement of the law; and any future use of a legally constituted "posse" must be restricted in racial matters solely to effective law enforcement.

What this Court has said and what this Court will order as to the sheriff of Dallas County and his agents, including a legal "posse," does not mean that the sheriff cannot and should not continue to fulfill his necessary and legal functions of conserving the peace in Dallas County. What this Court does mean and what its injunctive order will be designed to prevent is the future actions and conduct of the sheriff, his deputies and others who may act in concert with him, in intimidating, or using or threatening to use unreasonable force against Negroes and others acting with them, in seeking to exercise or exercising voting and public accommodation rights.

■ This Court is extremely sensitive to the principle of comity existing between Federal and State courts; in recognition of this principle—even though there is clear mandatory statutory jurisdiction and evidence to warrant injunctive action of a preventive type, it is felt that the other relief that is to be afforded in this case will make it unnecessary for this Court to issue an injunction at this time against Circuit Judge Hare, Solicitor McLeod and Probate Judge Reynolds. Jurisdiction as to these parties will be retained.

■ As to the City of Selma, the law is clear that the City may be sued under 42 U.S.C. § 1971(b) and Title II of the Civil Rights Act of 1964. Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 233, 84 S.Ct. 1226, 12 L.Ed.2d 256; Bailey v. Patterson (5th Cir. 1963), 323 F.2d 201; Holmes v. City of Atlanta (5th Cir. 1955), 223 F.2d 93, aff'd 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776. The argument of the City, based upon Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 and Egan v. City of Aurora, 365 U.S. 514, 81 S.Ct. 684, 5 L.Ed.2d 741, is not appropriate to the facts in this case. Monroe v. Pape and Egan v. City of Aurora both involved actions for damages under 42 U.S.C. § 1983. In this connection see Judge Rives' dissent in Bailey v. Patterson (S.D.Miss., 1961), 199 F.Supp. 595, 615, vacated 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512.

■ The law is clear that a city cannot "effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be." Burton v. Wilmington Parking Authority, 365 U.S.

715, 81 S.Ct. 856, 6 L.Ed.2d 45; United States v. U. S. Klans (M.D.Ala., 1961), 194 F.Supp. 897; Lynch v. United States (5th Cir. 1951), 189 F.2d 476. However, the evidence that the City of Selma agreed for a short while to let the Dallas County sheriff's force take the lead in racial matters in Selma, will not justify this Court in concluding that the City of Selma has abdicated its responsibilities in this area. Furthermore, as to the City of Selma, the evidence in this case reflects that on October 5, 1964, Wilson Baker became the City's Director of Public Safety. Under the new director, the City has attempted in good faith to perform its duties and responsibilities under the law. This Court recognizes that the replacement of old officials will not, in and of itself, justify the denial of injunctive relief, United States v. Atkins (5th Cir. 1963), 323 F.2d 733; [12] however, because of the circumstances of this case, particularly the apparent conscientious efforts on the part of the city officials, effective in October 1964, to deal with their racial matters within the framework of the law, and in recognition of the applicable constitutional principles, no injunction will be issued at this time against the City of Selma. In proceeding in this manner, this Court is assuming that the City of Selma, through it officials, will not only refrain from all acts of harassment, coercion and intimidation, but will not fail to provide police protection to all persons attempting peaceably to exercise the right to vote or use public accommodations. This Court will, of course, reserve jurisdiction of this matter as well as the other matters and parties involved in this case.

In summary, an injunction will issue as to Sheriff Clark, his deputies, posse members and others acting in concert with him; this injunction will prohibit coercion, punishment, intimidation or harassment of Negroes or others acting with them in their exercise or attempts to exercise their constitutional rights under Title II of the Civil Rights Act of 1964 and 42 U.S.C. § 1971(b).

No action is necessary on the part of this Court concerning the arrests and prosecutions of the adults and juveniles that have been removed to the United States District Court for the Southern District of Alabama from the Dallas County Circuit and Probate Courts in view of the action taken by the United States District Court for the Southern District of Alabama in Civil Actions 3385 and 3388 prior to the filing of this opinion.

The Sheriff of Dallas County will be enjoined from any further use of the Dallas County posse, as that organization is presently constituted, in connection with any racial matters.

No action is necessary on the part of this Court at this time in connection with the injunction issued by Circuit Judge Hare on July 9, 1964, and removed to this Court in view of the dissolution of that injunction on the 16th day of April 1965 by the District Court in Civil Action 3388.

No injunction will issue at the present time as to Circuit Judge Hare, Solicitor McLeod, Probate Judge Reynolds, or the City of Selma, Alabama.

A formal order will be entered denying the defendants' motion "to exclude the plaintiffs' testimony." In addition, a formal order, including an injunction, will be issued in accordance with the foregoing.

Jurisdiction as to all matters involved herein and all parties hereto is expressly retained. Costs incurred in this proceeding will be taxed against the defendant James G. Clark, Jr., as Sheriff of Dallas County, Alabama.

12. See also United States v. W. T. Grant, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303; Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, and Anderson v. City of Albany (5th Cir. 1963), 321 F.2d 649.

APPENDIX "A"

DALLAS COUNTY STATISTICS

| Year | | Total Applied | | Accepted | | Rejected | | Percent Rejected | |
|---|---|---|---|---|---|---|---|---|---|
| 1961 | | W | N | W | N | W | N | W | N |
| June | W | 12 | | 10 | | 2 | | 16 | |
| | N | | 13 | | 2 | | 11 | | 84 |
| July | W | 13 | | 12 | | 1 | | 7.7 | |
| | N | | 4 | | 4 | | 0 | | 0 |
| August | W | 9 | | 8 | | 1 | | 11 | |
| | N | | 12 | | 7 | | 5 | | 41 |
| Sept. | W | 10 | | 9 | | 1 | | 10 | |
| | N | | 19 | | 11 | | 8 | | 42 |
| Oct. | W | 30 | | 28 | | 2 | | 7 | |
| | N | | 19 | | 14 | | 5 | | 27 |
| Nov. | W | 45 | | 43 | | 2 | | 4 | |
| | N | | 29 | | 18 | | 11 | | 38 |
| Dec. | W | 15 | | 13 | | 2 | | 13 | |
| | N | | 4 | | 3 | | 1 | | 25 |
| 1962 | | | | | | | | | |
| Jan. | W | 158 | | 144 | | 14 | | 9 | |
| | N | | 5 | | 4 | | 1 | | 20 |
| Feb. | W | 128 | | 115 | | 13 | | 10 | |
| | N | | 3 | | 2 | | 1 | | 33 |
| March | W | 33 | | 30 | | 3 | | 9 | |
| | N | | 3 | | 2 | | 1 | | 33 |
| April | W | 15 | | 13 | | 2 | | 13 | |
| | N | | 4 | | 3 | | 1 | | 25 |
| May | W | 6 | | 6 | | 0 | | 0 | |
| | N | | 2 | | 1 | | 1 | | 50.0 |
| June | W | 3 | | 3 | | 0 | | 0 | |
| | N | | 2 | | 1 | | 1 | | 50.0 |
| July | W | 9 | | 9 | | 0 | | 0 | |
| | N | | 10 | | 5 | | 5 | | 50.0 |
| August | W | 11 | | 11 | | 0 | | 0 | |
| | N | | 2 | | 0 | | 2 | | 100.0 |
| Sept. | W | 9 | | 8 | | 1 | | 11.1 | |
| | N | | 0 | | 0 | | 0 | | 0 |
| Oct. | W | 16 | | 16 | | 0 | | 0 | |
| | N | | 0 | | 0 | | 0 | | 0 |
| Nov. | W | 14 | | 13 | | 1 | | 7.1 | |
| | N | | 3 | | 2 | | 1 | | 33.3 |
| Dec. | W | 5 | | 3 | | 2 | | 40 | |
| | N | | 2 | | 0 | | 2 | | 100.0 |

| Year | | Total Applied | | Accepted | | Rejected | | Percent Rejected | |
|---|---|---|---|---|---|---|---|---|---|
| 1963 | | W | N | W | N | W | N | W | N |
| Jan. | W | 73 | | 59 | | 14 | | 19.2 | |
| | N | | 3 | | 1 | | 2 | | 66.7 |
| Feb. | W | 21 | | 12 | | 9 | | 42.8 | |
| | N | | 14 | | 7 | | 7 | | 50.0 |
| March | W | 9 | | 7 | | 2 | | 22.2 | |
| | N | | 17 | | 0 | | 17 | | 100.0 |
| April | W | 5 | | 2 | | 3 | | 60.0 | |
| | N | | 17 | | 0 | | 17 | | 100.0 |
| May | W | 29 | | 16 | | 13 | | 44.8 | |
| | N | | 31 | | 1 | | 30 | | 96.8 |
| June | W | 45 | | 31 | | 14 | | 31.1 | |
| | N | | 41 | | 6 | | 35 | | 85.4 |
| July | W | 69 | | 52 | | 17 | | 24.6 | |
| | N | | 38 | | 7 | | 31 | | 81.6 |
| August | W | 33 | | 21 | | 12 | | 36.7 | |
| | N | | 64 | | 7 | | 57 | | 89.0 |
| Sept. | W | 42 | | 34 | | 8 | | 19.0 | |
| | N | | 7 | | 1 | | 6 | | 85.7 |
| Oct. | W | 296 | | 219 | | 77 | | 26.0 | |
| | N | | 215 | | 11 | | 204 | | 94.9 |
| Nov. | W | 115 | | 78 | | 37 | | 32.2 | |
| | N | | 55 | | 4 | | 51 | | 92.7 |
| Dec. | W | 46 | | 42 | | 4 | | 8.7 | |
| | N | | 20 | | 3 | | 17 | | 85.0 |
| 1964 | | | | | | | | | |
| Jan. | W | 246 | | 197 | | 49 | | 19.9 | |
| | N | | 54 | | 15 | | 39 | | 72.2 |
| Feb. | W | 22 | | 16 | | 6 | | 27.3 | |
| | N | | 27 | | 1 | | 26 | | 96.3 |
| March | W | 31 | | 26 | | 5 | | 16.1 | |
| | N | | 12 | | 2 | | 10 | | 83.3 |
| April | W | 13 | | 11 | | 2 | | 15.4 | |
| | N | | 23 | | 3 | | 20 | | 86.9 |
| May | W | 10 | | 8 | | 2 | | 20.0 | |
| | N | | 12 | | 4 | | 8 | | 66.7 |
| June | W | 7 | | 7 | | 0 | | 0 | |
| | N | | 14 | | 2 | | 12 | | 85.7 |
| July | W | 22 | | 15 | | 7 | | 31.8 | |
| | N | | 98 | | 6 | | 92 | | 93.9 |
| August | W | 25 | | 23 | | 2 | | 8.0 | |
| | N | | 12 | | 3 | | 9 | | 75.0 |
| Sept. | W | 13 | | 12 | | 1 | | 7.7 | |
| | N | | 10 | | 2 | | 8 | | 80.0 |

| Year | | Total Applied | | Accepted | | Rejected | | Percent Rejected | |
|---|---|---|---|---|---|---|---|---|---|
| 1964 | | W | N | W | N | W | N | W | N |
| Oct. | W | 23 | | 20 | | 3 | | 13.0 | |
| | N | | * | | * | | 5 | | – |
| Nov. | W | 7 | | 7 | | 0 | | 0 | |
| | N | | 7 | | 1 | | 6 | | 85.7 |
| Dec. | W | 0 | | 0 | | 0 | | 0 | |
| | N | | 14 | | 0 | | 14 | | 100 |
| 1965 | | | | | | | | | |
| Jan. | W | 52 | | 24 | | 28 | | 53.8 | |
| | N | | 112 | | 12 | | 100 | | 89.3 |
| Feb. | W | 33 | | 32 | | 1 | | 3.0 | |
| | N | | 95 | | 36 | | 59 | | 62.1 |
| | | 1,828 | 1,148 | 1,465 | 214 | 363 | 939 | | |

\* Figures not obtained; the Board accepted applications on one day in October 1964.

---

## APPENDIX "B"
### Civil Rights Act of 1964
(P.L. 88–352)

Sec. 201. (a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this title if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

(1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

(4) any establishment (A) (i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

\*   \*   \*   \*   \*

Sec. 202. All persons shall be entitled to be free, at any establishment or place, from discrimination or segregation of any kind on the ground of race, color, religion, or national origin, if such discrimination or segregation is or purports to be required by any law, statute, ordinance, regulation, rule, or order of a State or any agency or political subdivision thereof.

Sec. 203. No person shall (a) withhold, deny, or attempt to withhold or

deny, or deprive or attempt to deprive, any person of any right or privilege secured by section 201 or 202, or (b) intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person with the purpose of interfering with any right or privilege secured by section 201 or 202, or (c) punish or attempt to punish any person for exercising or attempting to exercise any right or privilege secured by section 201 or 202.

Sec. 204. (a) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 203, a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved and, upon timely application, the court may, in its discretion, permit the Attorney General to intervene in such civil action if he certifies that the case is of general public importance. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the civil action without the payment of fees, costs, or security.

*　　*　　*　　*　　*

Sec. 206. (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this title, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

*　　*　　*　　*　　*

## 42 U.S.C. § 1971

§ 1971. Voting rights—Race, color, or previous condition not to affect right to vote  *  *  *

(a) (1) All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding.

*　　*　　*　　*　　*　　*

(b) No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, presidential elector, Member of the Senate, or Member of the House of Representatives, Delegates or Commissioners from the Territories or possessions, at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate.

(c) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order. * * *