**Ezell LITTLETON et al., Plaintiffs-Appellants,**

**v.**

**Peyton BERBLING, individually and as State's Attorney for Alexander County, Illinois, et al., Defendants-Appellees.**

**No. 71–1395.**

United States Court of Appeals, Seventh Circuit.

Argued March 1, 1972.

Decided Oct. 6, 1972.

Stay Granted Dec. 11, 1972.

See 93 S.Ct. 547.

John Bleveans, Cairo, Ill., Alan M. Wiseman, James B. O'Shaughnessy, Chicago, Ill., for plaintiffs-appellants.

John M. Ferguson, Harold G. Baker, Jr., Belleville, Ill., William J. Scott, Atty. Gen., Francis T. Crowe, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before SWYGERT, Chief Judge, PELL, Circuit Judge, and DILLIN, District Judge.*

PELL, Circuit Judge.

This appeal is from a dismissal by the district court of plaintiffs' amended complaint. Plaintiffs brought this action under 42 U.S.C. §§ 1981, 1982, 1983 and 1985, seeking, in addition to damages, injunctive relief for claimed deprivations, under color of law, custom and usage of Cairo, and Alexander County, Illinois, of various rights and immunities secured to plaintiffs and members of their class under the Constitution of the United States and the above-named sections of Title 42. Jurisdiction was founded on 28 U.S.C. §§ 1331 and 1343.

This court, in reviewing the district court's dismissal of plaintiffs' amended complaint, must construe the amended complaint liberally and consider all of the factual allegations to be true, resolving any doubts in plaintiffs' favor. Jung v. K. & D. Mining Co., 260 F.2d 607, 608 (7th Cir. 1958); Contract Buyers League v. F & F Investment, 300 F.Supp. 210, 214 (N.D.Ill.1969), aff'd sub nom. Baker v. F & F Investment, 420 F.2d 1191 (7th Cir. 1970), cert. denied, Universal Builder's Inc. v. Clark, 400 U.S. 821, 91 S.Ct. 40, 27 L.Ed.2d 49. We are not here concerned whether the plaintiffs will be able to adduce competent proof of their allegations.

Plaintiffs, in substance, charge that the defendants, functionaries of Alexander County, have systematically applied the state criminal laws so as to discriminate against plaintiffs and their class on the basis of race, interfering thereby with the free exercise of their constitutional rights.

The named plaintiffs, with two exceptions, are black citizens of Cairo. The plaintiffs, allegedly financially poor persons, name as their class all other persons similarly situated, presumably as to race and poverty.

Defendant Berbling is the State's Attorney for Alexander County. Defendant O'Shea at the time of the commencement of this suit was a Magistrate of the Circuit Court for Alexander County and on July 1, 1971, became an Associate Judge of Alexander County. Defendant Spomer is an Associate Judge of the Circuit Court for Alexander County. Defendant Shepherd is an investigator for defendant Berbling, but is not himself an Assistant State's Attorney.

As to each of the defendants, it is alleged that since the early 1960's, black citizens of Cairo have been actively seeking equal opportunity and treatment in such areas as employment, housing, education and ordinary day-to-day relations with white citizens and officials of Cairo. One of the important manifestations of the equality quest is the participation by the plaintiffs and their encouragement of others to do likewise in an economic boycott of local merchants deemed to have engaged in racial discrimination. The equality quest allegedly has generated and continues to generate substantial tension and antagonism from the white citizens and officials. It appears that in addition to the boycott there were peaceful demonstrations.

We now turn to the allegations pertaining to particular defendants, treating such charges as true for the purpose of this appeal.

BERBLING CONDUCT

Berbling engages in a pattern and practice of refusing to permit black citizens to give evidence of criminal conduct committed by white citizens against black citizens. He refuses to initiate criminal proceedings against white citizens arising out of assaults and batteries committed by them against black citizens. He refuses to proceed on black citizen complaints by information or complaint but submits such matters to a grand jury in those instances in which he permits complaints to be filed. He inter-

---

* District Judge S. Hugh Dillin of the Southern District of Indiana is sitting by designation.

rogates the black citizens before the grand jury with the purposeful intent of depriving the black citizens of their right to present their evidence to the grand jury. In some instances before the grand jury, he declines to interrogate the black complainants at all. When white persons are prosecuted on the basis of complaints by plaintiffs, Berbling engages in a practice of inadequately prosecuting in order to lose the cases or to settle them on terms more favorable than those accorded black persons. He engages in the practice of requesting or recommending greater bonds and sentences in cases involving black persons than those of white persons. He engages in a practice of bringing significantly more serious charges against plaintiffs for conduct which would result in no charge or a minor charge against white persons.

All of the above alleged practices are assertedly carried on by Berbling "wilfully and maliciously with the intent (a) to deprive plaintiffs of the benefits of the criminal justice system, (b) to deprive plaintiffs of their right to give evidence against those who threaten their security, peace and tranquility and to deprive plaintiffs of their right to hold property to the same extent as is enjoyed by white citizens, and (c) to deter plaintiffs from engaging in a peaceful boycott and other activities protected by the First Amendment."

Specific instances of illustrative supporting conduct pertaining to named individual plaintiffs are set forth in the amended complaint.

## SHEPHERD CONDUCT

He engages in a pattern and practice of refusing to permit plaintiffs to give evidence against white persons respecting acts threatening the personal safety of plaintiffs. The illustrative specific incident, however, is that Shepherd refused to permit one of the plaintiffs, because of her race, to file criminal charges against a white man who had kicked her in the stomach while she was peacefully demonstrating "against the racially discriminatory practices of merchants and public officials."

The example in the complaint seems questionably illustrative of the allegation with regard to the discriminatory pattern and practice and, in any event, there would seem to be some question of Shepherd's authority to decline to file criminal charges as he, as we understand it, was an investigator only.

## SHEPHERD and BERBLING CONDUCT

A conspiracy is charged against Berbling and Shepherd in that they engage in conduct that prevents plaintiffs because of their race from giving evidence against white persons respecting acts threatening plaintiffs' personal safety.

The illustrative example was the same incident alleged as to Shepherd individually except that here it is alleged that Shepherd, "at Berbling's direction, and because of her race, refused to allow" the filing of the complaint.

Questions existing here also arise from the specific illustration utilized.

## SPOMER and O'SHEA CONDUCT

Spomer and O'Shea, as judges, engage in a pattern and practice of discriminatory conduct based on race as follows: They set bond in criminal cases by following an unofficial bond schedule without regard to the facts of a case or circumstances of an individual defendant. They sentence black persons to longer criminal terms and impose harsher conditions than they do for white persons who are charged with the same or equivalent conduct. They require plaintiffs and members of their class, when charged with violations of city ordinances which carry fines and possible jail penalties, if the fine cannot be paid, to pay for a trial by jury.[1]

1. Since Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971), it has been unlawful to convert a fine into a jail sentence for those who are unable to pay. Nor is there any constitutional requirement of a jury trial for offenses

We have attempted in the foregoing summary to provide a condensation of the principal allegations of a 21-page complaint. We do not commend the amended complaint as a model of pleading but we also recognize that uncharted fields were being plowed. Matters of which an entire community may be cognizant may well pose almost insuperable difficulties when the attempt is made to articulate these matters into the "short and plain statement" required by Rule 8 (a), Fed.R.Civ.P.

It has been said that in Civil Rights Act cases, highly specific factual averments are required to defeat a motion to dismiss, otherwise "every complaint against a State official by the simple expedient of averring conclusions would be cognizable in the federal courts under the Civil Rights Act." United States ex rel. Hoge v. Bolsinger, 211 F.Supp. 199, 201 (W.D.Pa. 1962), aff'd, 311 F.2d 215 (3rd Cir. 1962), cert. denied, 372 U.S. 931, 83 S.Ct. 878, 9 L.Ed.2d 735 (1963).

■■ Nevertheless, we recognize the underlying motivation of federal pleading to be to avoid the semantical donnybrooks inherent in differentiating what is evidence, ultimate facts and conclusions of law and fact. See 5 Wright & Miller, Federal Practice and Procedure: Civil § 1218, at 133 et seq. (1969). We deem it preferable that dismissal should be sparingly used whenever it appears that a basis for federal jurisdiction in fact exists or may exist and can be stated by plaintiff. Wright & Miller, *supra*, § 1214, at 107. This, of course, does not provide a carte blanche for unlimited successive complaint amendments, and the ultimate duty of pleading his case rests upon the party and not upon

the district court to divine what is not reasonably there.

The approach which we find should be applied here is aptly stated in Kamen Soap Products Co. v. Struthers Wells Corp., 159 F.Supp. 706, 713 (S.D.N.Y. 1958), as follows:

"While the complaint is prolix and contains a large amount of unnecessary detail and evidentiary matter, it clearly apprises defendants of the claims they are called upon to meet. Motions to dismiss under the Federal Rules on such grounds as these are not favored."

*See also* Byrd v. Bates, 220 F.2d 480, 482 (5th Cir. 1955).

The appeal here is taken from the dismissal which the district court rested on two grounds, lack of jurisdiction and judicial immunity. It is the propriety of this ruling which is all that is before us and which we now consider in the light of the applicable law. We do not, as we have already indicated, venture any opinion as to whether the plaintiffs will be able to prove the concerted pattern of officially sponsored racial discrimination under color of law, custom and usage as here alleged.[2]

## LACK OF JURISDICTION

The district court treated the case insofar as an injunction was sought as being an effort to have the federal court sit as a court of review over the acts and actions of duly elected county officials.

The court's memorandum and order states in part the following:

" . . . What plaintiffs seek in their request for injunctive relief is merely to have this Court submit its judgment for the judgment of the

---

which do not have a potential jail sentence. Baldwin v. New York, 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970), and Argersinger v. Hamlin, 407 U.S. 25, 27–30, 92 S.Ct. 2006, 2008, 32 L.Ed.2d 530 (1972). Thus, unless plaintiffs are alleging that only they and members of their class were forced to pay for jury trials in this context, there

has been no constitutional deprivation on this point.

2. The term "creed" is used jointly or alternatively with "race" throughout the complaint but we fail to discern any basis for the use and the complaint seems bottomed only upon racial discrimination.

above-named elected officials of Alexander County. Under the circumstances here presented, the Court does not have jurisdiction to entertain such a cause.

"Plaintiffs cite cases in which federal courts have enjoined acts of elective state officials under certain circumstances, not here present. However, in none of the cases cited have the federal courts been granted power to substitute their judgment for that of the elected state officials. The matters complained of in the amended complaint as against the above-named elective officials are at most discretionary acts on their part.

"Accordingly, that portion of the complaint seeking injunctive relief against the associate circuit judge, magistrate, state's attorney and assistant to the state's attorney will be dismissed for failure of jurisdiction in this Court."

■ The amended complaint primarily involves federal jurisdiction under 28 U.S.C. § 1343(3) and (4) [3] giving federal jurisdiction for deprivation of federally protected civil rights. In our reading of the complaint, violations of these rights have been alleged.

The test for determining whether jurisdiction exists is set out in Bell v. Hood, 327 U.S. 678, 682–683, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946):

"Jurisdiction, therefore, is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. . . . But as we have already pointed out the alleged violations of the Constitution here are not immaterial but form rather the sole basis of the relief sought. Nor can we say that the cause of action alleged is so patently without merit as to justify, even under the qualifications noted, the court's dismissal for want of jurisdiction."

The present case clearly fits the above language from Bell v. Hood, and we must, therefore, hold that the district court erred in dismissing the complaint for want of jurisdiction as the alleged constitutional and statutory violations do "form the sole basis for relief" and the action is not "so patently without merit as to justify" the court's dismissal.

## JUDICIAL IMMUNITY

In dismissing the case, while there was reference to want of jurisdiction, the district court's opinion stressed that the complaint sought to review matters of judicial discretion. It would seem that the dismissal was, in reality, one for failure to state a claim upon which relief could be granted, Rule 12(b)(6), Fed.R.Civ.P. It is on that alternative theory for the district court's actions that we will proceed.

---

3. 28 U.S.C. § 1343 reads as follows:
"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

. . . . .

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
(4) To recover damages or to secure equitable or other relief under any Act

of Congress providing for the protection of civil rights, including the right to vote."
Under this section, there is no requirement that the amount in controversy exceeds $10,000. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 412 n. 1, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).
Plaintiffs also invoked 28 U.S.C. § 1331, which provides for federal question jurisdiction where the amount in controversy exceeds $10,000. Since there is doubt as to whether any of the claims for damages can be affirmed, we rest our finding of federal jurisdiction on 28 U.S.C. § 1343.

Defendants contend that as judicial and quasi-judicial officers they were not liable in civil suits at common law and that the various civil rights acts did nothing to change this rule. Thus, we must first examine the legislative history of those acts to determine whether or not allegations such as those in the complaint before us were intended by Congress to be actionable. Simply stated, that question raises to issue whether or not Congress, in passing these acts, intended to eliminate the doctrine of judicial immunity. With that necessary background, we can then consider subsequent judicial decisions which have added substantial glosses to these statutes.

When Congress convened in December 1865, it faced a country that had been torn asunder by a great war. Undoubtedly to many members of Congress there was a clear threat that one reason for fighting the war, freedom and equality for blacks, might be lost. The first reaction of the South to defeat and emancipation had been shock and "a simultaneous withdrawal of both races from the enforced intimacy and the more burdensome obligations imposed by the old regime on each [race]." [4] However, this reaction was shortlived:

> "The temporary anarchy that followed the collapse of the old discipline produced a state of mind bordering on hysteria among Southern white people. The first year a great fear of black insurrection and revenge seized

many minds, and for a longer time the conviction prevailed that Negroes could not be induced to work without compulsion. . . . In the presence of these conditions the provisional legislatures established by President Johnson in 1865 adopted the notorious Black Codes. Some of them were intended to establish systems of peonage or apprenticeship resembling slavery." [5]

When Senator Trumbull of Illinois, Chairman of the Judiciary Committee, introduced S. 61 on January 5, 1866, it was with the view that strong legislation was necessary. This bill, which was to become the Civil Rights Act of 1866, sought to eliminate both state laws and private conduct which discriminated on the basis of race. In introducing the bill, Senator Trumbull "described its objectives in terms that belie any attempt to read it narrowly." Jones v. Alfred H. Mayer Co., 392 U.S. 409, 431, 88 S.Ct. 2186, 2199, 20 L.Ed.2d 1189 (1968).[6]

Title 42 U.S.C. §§ 1981 and 1982 derive from the Civil Rights Act of April 9, 1866, ch. 31, § 1, 14 Stat. 27.[7] "In the House, as in the Senate, much was said about eliminating the infamous Black Codes. But, like the Senate, the House was moved by a larger objective—that of giving real content to the freedom guaranteed by the Thirteenth Amendment." Jones v. Alfred H. Mayer Co., supra, 392 U.S. at 433, 88 S.Ct. at 2200.

4. C. Vann Woodward, The Strange Career of Jim Crow (2nd revised ed. 1966), 22.

5. Id. at 23.

6. "Mr. President, I regard the bill to which the attention of the Senate is now called as the most important measure that has been under its consideration since the adoption of the constitutional amendment abolishing slavery. That amendment declared that all persons in the United States should be free. This measure is intended to give effect to that declaration and secure to all persons within the United States practical freedom. There is very little importance in the general declaration of

abstract truths and principles unless they can be carried into effect, unless the persons who are to be affected by them have some means of availing themselves of their benefits," Senator Trumbull, Cong.Globe, 39th Congress, 1st Sess., 474.

7. Title 42 U.S.C. § 1981 was reenacted with some additions after the ratification of the Fourteenth Amendment as the Civil Rights Act of May 31, 1870, ch. 114, § 16, 16 Stat. 144. San Mateo County v. Southern Pacific R. Co., 13 F. 145, 151 (C.C.Cal.1882). Title 42 U.S.C. § 1982 flows directly from the Civil Rights Act of 1866, via R.S. § 1978.

In essence, what § 1 of the Civil Rights Act of 1866 intended was to eliminate those badges and indicia of slavery which were still a part of both Southern law and custom. In re Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). But, not until Jones v. Alfred H. Mayer Co., *supra*, did the Supreme Court agree that Congress meant what it said in 42 U.S.C. § 1982, which by its own terms encompassed all racially motivated refusals to rent or sell without being limited to those acts sanctioned by the state, "under color of State law."

For the present case, the more important aspect of the Civil Rights Act of 1866 was § 2, which became Title 18 U.S.C. § 242.[8] As originally enacted this section provided,

"§ 2. *And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or by reason of his color or race, than is prescribed for punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by a fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court."

The plain words of the statute would seem to include "any person," even prosecutors and judges, and this was the subject of extensive debate. When the bill was first being introduced, Senator Trumbull hesitated to say that it would reach conduct of judges.[9] However, as the debate moved on, Senator Stewart noted that the fugitive slave laws had done exactly what the opponents of the bill complained of, made criminal *all* actions by persons to effectuate state laws which Congress had determined to overthrow.[10]

The issue was clearly drawn in President Johnson's veto message on March 27, 1866,[11] where he gave as a major objection to § 2 of the bill that it would make legislators and judges criminally liable. The veto was overridden. In these final debates, Senator Trumbull, the bill's sponsor and principal advocate, stated,

"But it is said that under this provision judges of the courts and ministerial officers who are engaged in the execution of any such statutes may be punished; and that is made an objection to this bill. I admit that a ministerial officer or a judge, if he acts corruptly or viciously in the execution or under color of an illegal act, may be and ought to be punished; but if he acted innocently the judge would not be punished."[12]

It is significant to note in these debates that the acts of a legislator were viewed as probably not falling within the prohibition since the legislator himself in voting for a bill was not actually denying anyone his civil rights.

---

8. "Section 242 first came into the law as § 2 of the Civil Rights Act, Act of April 9, 1866, 14 Stat. 27. After passage of the Fourteenth Amendment, this provision was re-enacted and amended by §§ 17, 18, Act of May 31, 1870, 16 Stat. 140, 144." Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961).

9. Mr. Cowan. "Then I will ask if that does not come in conflict with another principle of law—whether a judge in a criminal court can be held responsible for the integrity of his intentions as to the decisions he makes?"
 Mr. Trumbull. "That would involve many considerations, and they will be settled by the courts when they arise. If he is not responsible, I have faith that the judges of the United States courts will so decide." Cong.Globe, 39th Cong., 1st Sess. (1866), 475–476.

10. *Id.* at 500.

11. *Id.* at 1679–81.

12. *Id.* at 1758.

Mr. Trumbull. "Who is to be punished? Is the law to be punished? Are the men who make the law to be punished? Is that the language of the bill? Not at all. If any person, 'under color of any law,' shall subject another to the deprivation of a right to which he is entitled, he is to be punished. Who? The person who, under the color of the law, does the act, not the men who made the law." Cong. Globe, 39th Cong., 1st Sess., 1758.

To further clarify the applicability of the Civil Rights Act of 1866 to just the sort of facts we have before us, we need only note the remarks of Congressman Lawrence who, in commenting on combinations of white persons organized to drive freedmen out of various communities, stated, "If States should undertake to authorize such offenses, or deny to a class of citizens all protection against them, we may then inquire whether the nation itself may be destroyed by this insidious means." [13] It appears to us that in 1866, in considering criminal sanctions, Congress clearly had decided to eliminate judicial immunity at least for *racially motivated intentional deprivations of civil rights.*

In 1870, after ratification of the Fourteenth Amendment, Congress decided to reenact some of the previously enacted provisions of the 1866 Act, probably with the view that if they were too broad to be constitutional under the Thirteenth Amendment they would be valid under the Fourteenth.[14] Thus, as noted above, 18 U.S.C. § 242 was reenacted and amended, as was 42 U.S.C. § 1981. Once again, the legislative history of the bill shows that Congress intended to cover a wide field, specifically enacting the predecessor to 18 U.S.C. § 241 which covered private conspiracies to deprive individuals of civil rights. Perhaps the most informative statements were those by Senator Pool of North Carolina in support of Sections 5, 6 and 7 of the Enforcement Act of 1870:

"The civil rights bill was to be enforced by making it criminal for any officer, under color of any State law, 'to subject, or cause to be subjected, any citizen to the deprivation of any of the rights secured and protected' by the act. If an officer of any State were indicted for subjecting a citizen to the deprivation of any of those rights he was not to be indicted as an officer; it was as an individual. And so, under the fourteenth amendment to the Constitution, 'no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.' There the word 'deny' is used again; it is used in contradistinction to the first clause, which says, 'No State shall make or enforce any law' which shall do so and so. That would be a positive act which would contravene the right of a citizen; *but to say that it shall not deny to any person the equal protection of the law it seems to me opens up a different branch of the subject. It shall not deny by acts of omission, by a failure to prevent its own citizens from depriving by force any of their fellow-citizens of these rights.* It is only when a State omits to carry into effect the provisions of the civil rights act, and to secure the citizens in their rights, that the provisions of the fifth section of the four-

---

13. *Id.* at 1835.

14. "Others supported the adoption of the [Fourteenth] Amendment in order to eliminate doubt as to the constitutional validity of the Civil Rights Act as applied to the States." Hurd v. Hodge, 334 U.S. 24, 32–33, 68 S.Ct. 847, 852, 92 L.Ed. 1187 (1948).

Section 18 of the Enforcement Act of 1870, was the portion which reenacted the previous Act:
"*And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication passed April nine, eighteen hundred and sixty-six, is hereby re-enacted. . . . ."

teenth amendment would be called into operation, which is, 'that Congress shall enforce by appropriate legislation the provisions of this article.'

*"There is no legislation that could reach a State to prevent its passing a law. It can only reach the individual citizens of the State in the enforcement of law."* (Emphasis added.) [15] As the Supreme Court stated relative to the scope of § 241, "despite subsequent statements to the contrary, nothing in the records of the congressional debates or the Joint Committee on Reconstruction indicates any uncertainty that its objective was the protection of civil rights." United States v. Price, 383 U.S. 787, 801 n. 9, 86 S.Ct. 1152, 1160 16 L.Ed.2d 267 (1966).

Admittedly, the crucial sections for plaintiffs—that is, the ones most central to their complaint—are 42 U.S.C. §§ 1983 and 1985(3). But, in discussing their legislative history to determine congressional intent, it is clearly relevant to consider the above discussion of 18 U.S.C. §§ 241, 242, as they are the criminal analogues to the civil remedies provided in §§ 1983, 1985(3). In fact, the Supreme Court in determining how the phrase "under color of" should be interpreted stated, "Thus, it is beyond doubt that this phrase should be accorded the same construction in both statutes—in § 1979 [now 42 U.S.C. § 1983] and in 18 U.S.C. § 242." Monroe v. Pape, 365 U.S. 167, 185, 81 S.Ct. 473, 483, 5 L.Ed.2d 492

(1961). So in deciding what Congress meant when it referred to "[e]very person" in 42 U.S.C. § 1983, it is significant that Congress had earlier rejected specifically absolute judicial immunity by passing the Civil Rights Act of 1866.

As to the congressional debates surrounding the Ku Klux Klan Act of April 20, 1871, ch. 22, 17 Stat. 13,[16] the very title of the bill reflects one of the main concerns that Congress had. On March 23, 1871, President Grant sent the following message to Congress:

"A condition of affairs now exists in some States of the Union rendering life and property insecure and the carrying of the mails and the collection of the revenue dangerous. The proof that such a condition of affairs exists in some localities is now before the Senate. That the power to correct these evils is beyond the control of State authorities I do not doubt; that the power of the Executive of the United States, acting within the limits of existing laws, is sufficient for present emergencies is not clear. Therefore, I urgently recommend such legislation as in the judgment of Congress shall effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States."[17]

The debates are replete with references both to private conspiracies and to inaction by state officials to curtail such activity.[18]

---

15. Cong.Globe, 41st Cong., 2nd Sess., 3611.

16. 42 U.S.C. § 1983 derives from § 1 of this Act and 42 U.S.C. § 1985(3) from § 2 of the Act.

17. Cong.Globe, 42nd Cong., 1st Sess., 244.

18. Mr. Lowe. "While murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens, the local administrations have been found inadequate or unwilling to apply the proper corrective. Combinations, darker than the night that hides them, conspiracies, wicked as the worst felons could devise, have gone unwhipped of justice. Immunity is given to crime, and the records of the public tribunals are

searched in vain for any evidence of effective redress." Cong.Globe, 42nd Cong., 1st Sess., 374.

Mr. Beatty. ". . . States have denied to persons within their jurisdiction the equal protection of the laws. . . . [M]en were murdered, houses were burned, women were outraged, men were scourged, and officers of the law shot down; and the State made no successful effort to bring the guilty to punishment or afford protection or redress to the outraged and innocent. *The State from lack of* power or *inclination, practically denied the equal protection of the law to these persons." Id.* at 428. (Emphasis added.)

Senator Osborn. "That the State courts in the several States have been

As Mr. Justice Douglas said in Monroe v. Pape, 365 U.S. 167, 174–175, 81 S.Ct. 473, 477, 5 L.Ed.2d 492 (1961), "[An] aim was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice . . . . It was not the unavailability of state remedies but the failure of certain States to enforce the laws with an equal hand that furnished the powerful momentum behind this 'force bill.'" Thus, it should be noted that while the primary evil sought to be checked was the Ku Klux Klan, 42 U.S.C. § 1983 applies not to Klan members but to those who, acting for the state, refuse or do not attempt to enforce state laws to protect all citizens. That the state laws themselves might appear on their face to be nondiscriminatory and yet be applied to protect only certain classes of citizens was stressed in the debates.[19] Nowhere is the present case more clearly shown to be encompassed by exactly the type of discrimination sought to be remedied by the Ku Klux Klan Act than in the statement of Senator Pratt of Indiana relating to discrimination against Negroes and Union sympathizers in enforcing criminal laws: [20]

> "Plausibly and sophistically it is said the laws of North Carolina do not discriminate against them; that the provisions in favor of rights and liberties

---

unable to enforce the criminal laws of their respective States or to suppress the disorders existing, and in fact that the preservation of life and property in many sections of the country is beyond the power of the State government, is a sufficient reason why Congress should, so far as they have authority under the Constitution, enact the laws necessary for the protection of citizens of the United States. The question of the constitutional authority for the requisite legislation has been sufficiently discussed." *Id.* at 653.

19. Mr. Burchard. "If the State Legislature pass a law discriminating against any portion of its citizens, or if it fails to enact provisions equally applicable to every class for the protection of their person and property, it will be admitted that the State does not afford the equal protection. But if the statutes show no discrimination, yet in its judicial tribunals one class is unable to secure that enforcement of their rights and punishment for their infraction which is accorded to another, or if secret combinations of men are allowed by the Executive to band together to deprive one class of citizens of their legal rights without a proper effort to discover, detect, and punish the violations of law and order, the State has not afforded to all its citizens the equal protection of the laws." Cong. Globe, 42nd Cong., 1st Sess., App. 315.
Mr. Hoar. "Now, it is an effectual denial by a State of the equal protection of the laws when any class of officers charged under the laws with their administration permanently and as a rule refuse to extend that protection. If every sheriff in South Carolina refuses to serve a writ for a colored man and those sheriffs are kept in office year after year by the people of South Carolina, and no verdict against them for their failure of duty can be obtained before a South Carolina jury, the State of South Carolina, through the class of officers who are its representatives to afford the equal protection of the laws to that class of citizens, has denied that protection. If the jurors of South Carolina constantly and as a rule refuse to do justice between man and man where the rights of a particular class of its citizens are concerned, and that State affords by its legislation no remedy, that is as much a denial to that class of citizens of the equal protection of the laws as if the State itself put on its statute-book a statute enacting that no verdict should be rendered in the courts of that State in favor of this class of citizens." *Id.* at 334.
Mr. Stevenson. "Denial may, therefore, be either active or passive. It is more frequently passive than active. That of Providence is nearly always passive; withholding, not giving, not granting is denying. . . . Unexecuted laws are not 'protection.' And this brings us to the very case: the States have laws providing for equal protection, but they do not, because either they will not or cannot, enforce them equally; and hence a class of citizens have not 'the protection of the laws.'" Cong.Globe, 42nd Cong., 1st Sess., App. 300.

20. It should be noted that the discrimination with which Congress was concerned was not purely racial but also included that against that class of whites who had Union sympathies. Nevertheless, the discrimination was against classes of people and not just specific individuals.

are general; that the courts are open to all; that juries, grand and petit, are commanded to hear and redress without distinction as to color, race, or political sentiment.

"But it is a fact, asserted in the report, that of the hundreds of outrages committed upon loyal people through the agency of this Ku Klux organization not one has been punished. This defect in the administration of the laws does not extend to other cases. Vigorously enough are the laws enforced against Union people. They only fail in efficiency when a man of known Union sentiments, white or black, invokes their aid. Then Justice closes the doors of her temples." [21]

Although Congress did substantially weaken § 2 of the bill (the predecessor of 42 U.S.C. § 1985(3)) which had sought to federalize virtually all state criminal laws, the intent of § 1 of the bill was and remained, at least in part, to hold liable those whose inaction caused or allowed to increase such criminal activity against given classes of citizens, since Congress was quite clear that such action constituted a deprivation of equal protection under the law which is a "deprivation of . . . rights . . . secured by the Constitution." [22]

One further aspect of legislative history must be noted. In discussing the scope of the coverage of the Ku Klux Klan Act, Mr. Hoar stated that it would only interfere where "evils have attained such a degree as amounts to the destruction, to the overthrow, to the denial to large classes of the people of the blessing of the republican government altogether." [23] Although this gloss has not been closely followed in many cases, e. g., Monroe v. Pape, *supra,* the fact that a situation of this nature exists, as alleged in the present complaint, would certainly seem to increase the logic of applying the statute as it is written, and not unduly narrowing it. As the Supreme Court has recently stated,

"This legislative history makes evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts." Mitchum v. Foster, 407 U.S. 225, 242, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705. (U.S. 1972).

21. Cong.Globe, 42nd Cong., 1st Sess., 505.

22. Mr. Pratt. "Though the laws do not in terms discriminate against them, still the fact is that they invoke their protection in vain in a great many localities, counties, and districts. There is either such a condition of public sentiment that they cannot be executed, or there is a complicity with their oppressors on the part of the officers who should, but do not, execute them.

"Now, sir, is not this state of things a practical denial of the equal protection of the laws? One of the definitions of the verb 'deny' is 'not to afford; to withhold.' Now, can it with fairness be said this equal protection is not denied, when it is withheld, when it is not afforded? Is there not a positive duty imposed on the States by this language to see to it—not only that the laws are equal, affording protection to all alike, but that they are executed, en-

forced; that their protection is not withheld, but afforded affirmatively, positively, to all in equal degree." Cong. Globe, 42nd Cong., 1st Sess., 506.

"The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws." Ex parte Virginia, 100 U.S. 339, 347, 25 L.Ed. 676 (1879).

"[T]he remedy created was not a remedy against it [the Klan] or its members but against those who representing a State in some capacity were *unable* or *unwilling* to enforce a state law." Monroe v. Pape, 365 U.S. at 175–176, 81 S. Ct. at 478. (Emphasis in original.)

*See also* discussion of United States v. Classic, at note 25, *infra.*

23. Cong.Globe, 42nd Cong., 1st Sess., 334.

In sum, ignoring for the time being the issue of immunity, it is clear that the complaint does state a cause of action against the judges under 42 U.S.C. §§ 1981, 1983 (and perhaps under 42 U.S.C. § 1982) since the judges are alleged to have imposed heavier fines and sentences and higher bails on plaintiffs' class than on the white citizens of Cairo. As against Berbling and Shepherd, it would appear that a violation of 42 U.S.C. § 1983 has been alleged in that they have denied to various plaintiffs equal access to the criminal justice system.[24] Further, it is clear that the failure to do one's duty is actionable under the statute as passed by Congress. Thus, criminal liability can attach from such a failure as in United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941).[25] Finally, the fact that 42 U.S.C. § 1981 does not itself contain a remedy is no objection. In a similar situation the Supreme Court stated, "[t]he fact that 42 U.S.C. § 1982 is couched in declaratory terms and provides no explicit method of enforcement does not, of course, prevent a federal court from fashioning an effective equitable remedy." Jones v. Alfred H. Mayer Co., *supra*, 392 U.S. at 414 n. 13, 88 S.Ct. at 2190. And more recently, it was held that "[t]he existence of a statutory right implies the existence of all necessary and appropriate remedies. See Texas & N.O. R. Co. v. [Brotherhood of] Railway [& S. S.] Clerks, 281 U.S. 548, 569–570 [, 50 S.Ct. 427, 74 L.Ed. 1034]." Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 239, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969).

This approach is not particularly new in federal jurisprudence. In one of the earliest and most frequently cited opinions of the Supreme Court, Chief Justice Marshall phrased the inquiry in the following terms:

"This brings us to the second inquiry; which is: If he has a right, and that right has been violated, do the laws of his country afford him a remedy?

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of the government is to afford that protection . . . . [Blackstone in his Commentaries states] ' . . . for it is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress.'

---

24. In a different context, a class action by indigent plaintiffs challenged a city ordinance requiring a fee for issuance of an arrest warrant. The Fifth Circuit held that the complaint stated a cause of action:

"It is well to note in connection with this controversy that a citizen has no constitutional right to have an arrest warrant issued. The only constitutional right involved here is the citizen's ability to set in motion the governmental machinery which redresses violations of municipal ordinances; *i. e.*, the right to seek an arrest warrant. Costs such as the fee in question here, no less than court costs, may be imposed but the teaching of Griffin v. Illinois, supra, is that concepts of equal protection in the administration of criminal law dictate that a poor person is not to be denied access to the criminal procedure process solely because of poverty." Lane v. Correll, 434 F.2d 598, 600 (5th Cir. 1970).

25. In *Classic*, the second count of the indictment charged the Commissioners of Election with a deprivation of constitutionally protected rights "by the willful failure and refusal of defendants to count the votes as cast. . . ." 313 U.S. at 309, 61 S.Ct. at 1034. Although the court did not pass on the sufficiency of the indictments because the appeal was a direct one following the district court's sustaining a demurrer, it is clear that plaintiffs' theory is not novel. *See also* Picking v. Pennsylvania R. Co., 151 F.2d 240, 250 (3rd Cir. 1945), overruled on another issue, Bauers v. Heisel, 361 F.2d 581 (3rd Cir. 1966), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed. 2d 457 (1967); Whirl v. Kern, 407 F.2d 781 (5th Cir. 1968), cert. denied, 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969).

"The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right. If this obloquy is to be cast on the jurisprudence of our country, it must arise from the peculiar character of the case." Marbury v. Madison, 1 Cranch (5 U.S.) 137, 162–163, 2 L.Ed. 60 (1803).

Having determined, in the light of the relevant statutory and case history, that on its face the complaint states a cause of action, we must consider whether defendants' alleged immunity necessarily bars the relief sought. Clearly, the statutes themselves are silent on the issue of immunity save for the fact that the term "every person" is used. The legislative history presents a strong case for finding that most immunities were meant to be swept away, at least for intentional deprivation of a class's rights.

Yet, the plain words of the various Civil Rights Acts have not always fared well in the courts. As the Northern ardor for further congressional legislative protection of the rights of Negroes dimmed and was virtually extinguished in 1877,[26] so did the courts follow a similar pattern. In the In re Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), the Supreme Court invalidated the 1st and 2nd Sections of the Civil Rights Act of 1875 which dealt with discrimination in public accommodations. The Court held that the Thirteenth Amendment related solely to badges and incidents of slavery,[27] that the Fourteenth Amendment required state action, and that private discrimination in accommodations fell within neither category.[28] Thus, it has been only recently that the Court has decided in handling

26. Concerning the election of 1876 and the Compromise of 1877, Samuel Eliot Morison wrote,

" . . . when the first returns came in its seemed that he [Tilden] had won, but the votes of three Southern States and Oregon were doubtful, and without them Tilden had only 184 electoral votes; if the Republicans carried those four states, Hayes would have 185.

"From all four disputed states came two sets of electoral votes. In South Carolina, Florida, and Louisiana, still under carpetbag rule, the election boards had thrown out thousands of Democratic votes on the ground of fraud or intimidation. Congress met the problem by setting up an electoral commission. . . . [T]here seems no doubt that a deal was made by the Republicans with Southern Democratic leaders, by virtue of which, in return for their acquiescence in Hayes's election, they promised on his behalf to withdraw the garrison and to wink at non-enforcement of Amendment XV, guaranteeing civil rights to the freedmen." S. E. Morison, The Oxford History of the American People (1965), pp. 733–734.

27. "The long existence of African slavery in this country gave us very distinct notions of what it was, and what were its necessary incidents. Compulsory service of the slave for the benefit of the master, restraint of his movements except by the master's will, disability to hold property, to make contracts, to have a standing in court, to be a witness against a white person, and such like burdens and incapacities, were the inseparable incidents of the institution. Severer punishments for crimes were imposed on the slave than on free persons guilty of the same offences. Congress, as we have seen, by the civil rights bill of 1866, passed in view of the thirteenth amendment, before the fourteenth was adopted, undertook to wipe out these burdens and disabilities, the necessary incidents of slavery constituting its substance and visible form . . . ." In re Civil Rights Cases, 109 U.S. 3, 22, 3 S.Ct. 18, 29, 27 L.Ed. 835 (1883).

28. We need only note in passing that the decision was greeted with great relief in much of the national press. 2 Charles Warren, The Supreme Court in United States History (1926), p. 604 et seq. The test of time has cast the lie to Warren's hopeful analysis:

"Viewed in historical perspective now, however, there can be no question that the decisions in these cases were most fortunate. They largely eliminated from National politics the negro question. . . ." Id. at 608.

the various Reconstruction civil rights statutes to "'accord [them] a sweep as broad as [their] language.' United States v. Price, 383 U.S. 787, 801, [86 S.Ct. 1152, 16 L.Ed.2d 267]; Jones v. Alfred H. Mayer Co., 392 U.S. 409, 437 [, 88 S.Ct. 2186, 20 L.Ed. 2d 1189]." Griffin v. Breckenridge, 403 U.S. 88, 97, 91 S.Ct. 1790, 1796, 29 L.Ed.2d 338 (1971).

Turning to judicial immunity from suit, one of the first major cases is Bradley v. Fisher, 80 U.S. 335, 13 Wall. 335, 20 L.Ed. 646 (1871).[29] The Court held that the judge was immune from suit as long as he had jurisdiction of the subject matter, no matter how irregular his actions might have been, nor how malicious or corrupt his motives might be. Such immunity was deemed essential to preserve the independence of the judiciary.[30]

But *Bradley*, although one of the earliest cases in which the Court approved of judicial immunity, was a common law action, not a case arising under any of the civil rights acts. Thus, it did not answer the question whether those acts had abolished such common law immunity. The first case in that category was Ex parte Virginia, 100 U.S. 339, 25 L. Ed. 676 (1879). There, a judge of a Virginia county court was indicted under the predecessor of 18 U.S.C. § 243

for excluding from the grand and petit jury lists black citizens who were otherwise qualified. The petition for habeas corpus was filed on behalf of the judge to determine if the district court below had jurisdiction or any authority to act —essentially a test of the validity of the statute. After holding that Congress had power under the Thirteenth and Fourteenth Amendments to enact such a law, the Court faced the petitioner's claim that he was immune since he was acting in the performance of a judicial act. The Court rejected the contention holding that the acts charged were not judicial, but merely ministerial.[31] However, in what may be regarded as an alternate ground for the holding, the Court went on to add,

"But if the selection of jurors could be considered in any case a judicial act, can the act charged against the petitioner be considered such when he acted outside of his authority and in direct violation of the spirit of the State statute? That statute gave him no authority, when selecting jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon

29. Plaintiff, an attorney, had sued to recover damages from the defendant, a justice of the Supreme Court of the District of Columbia, who had ordered Bradley's name stricken from the role of attorneys as a result of certain remarks Bradley had made to him during the trial of John Suratt for the murder of Abraham Lincoln. An earlier case to the same effect is Randall v. Brigham, 74 U.S. (7 Wall.) 523, 19 L.Ed. 285 (1868).

30. "For it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequence to himself. Liability to answer to every one who might feel himself aggrieved by the action of the judge, would be inconsistent with the

possession of his freedom, and would destroy that independence without which no judiciary can be either respectable or useful." 80 U.S. at 347, 20 L.Ed. 646.

31. "It was insisted during the argument on behalf of the petitioner that Congress cannot punish a State judge for his official acts; and it was assumed that Judge Cole, in selecting the jury as he did, was performing a judicial act. This assumption cannot be admitted. Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance. The duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge. . . . It is merely a ministerial act. . . ." 100 U.S. at 348, 25 L.Ed. 676.

State judges for their judicial action. It does no such thing." 100 U.S. at 348–349, 25 L.Ed. 676.

Thus, it would appear a judge can be held criminally liable for ministerial actions or actions "not within the limits of his discretion."

One of the few cases to hold a judicial officer liable for damages was Picking v. Pennsylvania R. Co., 151 F. 2d 240 (3rd Cir. 1945). There the district court had dismissed the complaint against a variety of defendants, including Keiffer, a justice of the peace. Plaintiffs alleged that when they were illegally arrested they sought to obtain their release at a hearing before Keiffer but that Keiffer refused to hold any hearing as he was required to do by law.

"If these allegations be proved it may be concluded that the refusal of Keiffer to act as required by law may have deprived the plaintiffs of their liberty without due process of law in violation of the Fourteenth Amendment. If the plaintiffs brought a proper proceeding to secure their liberty before Justice of the Peace Keiffer and he refused to hear their cause, he may be answerable to the plaintiffs in damages. The refusal of a state officer to perform a duty imposed on him by the law of his state because he has conspired with others in a conscious design to deprive a person of civil rights in legal effect may be the equivalent of action taken 'under the color' of the law of the state." 151 F.2d at 250.

But the court there also considered the immunity issue. After acknowledging the absolute judicial immunity which was the rule at common law, Judge Biggs stated,

"Congress possessed the power to wipe it out. We think that the conclusion is irresistible that Congress by enacting the Civil Rights Act sub judice intended to abrogate the privilege to the extent indicated by that act and

in fact did so. Section 1 of the third Civil Rights Act explictly applied to 'any person.' R. S. Section 1979 applies to 'every person.' We can imagine no broader definition. The statute must be deemed to include members of the state judiciary acting in official capacity. The result is of fateful portent to the judiciary of the several states. . . . But the policy involved is for Congress and not for the courts." *Id.* at 250.

We note that defendants in the case before us do not contend that Congress did not have the power to eliminate judicial immunity, but only that it did not in fact do so.

A few years after the *Picking* decision, the Supreme Court for the first time passed on the general scope of these sections of the 1871 Act. In Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), a member of the California legislature was being sued for statements and acts performed as chairman of a Senate committee. The Court held that Congress could not have meant to go so far as to eliminate legislative immunity: "The limits of §§ 1 and 2 of the 1871 statute—now §§ 43 and 47(3) of Title 8—were not spelled out in debate. We cannot believe that Congress—itself a staunch advocate of legislative freedom—would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language before us." 341 U.S. at 376, 71 S.Ct. at 788. Interestingly enough, the Court did not refer to the legislative history of the previous Civil Rights Acts, where, as noted above, the liability of state legislators had been discussed and specifically excluded.

In 1966, in Bauers v. Heisel, 361 F.2d 581 (3rd Cir. 1966), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967), the Third Circuit, sitting en banc, overruled Picking v. Pennsylvania R. Co., *supra*, relying in part on *Tenney*, in part on one of the most complete compilation of cases ever made in this

area,[32] and in part on its own reassessment of the policy involved. This brought it into conformity with the rule in this Circuit which has held judges immune from damage suits for acts they did in discharge of their official duties, e. g., Peckham v. Scanlon, 241 F.2d 761 (7th Cir. 1957); Stift v. Lynch, 267 F.2d 237 (7th Cir. 1959).[33]

The issue was finally put to rest by the Supreme Court in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), a crucial case, although not cited by defendants. There a state court judge was sued for damages under 42 U.S.C. § 1983 for his adjudging certain civil rights demonstrators "guilty when their cases came before his court."[34] After discussing the importance of judicial immunity as developed in Bradley v. Fisher, supra, the Court applied the Tenney v. Brandhove type of analysis to the situation, finding no specific intent of Congress to abrogate the doctrine.[35] Thus, the Court rejected the position propounded by Mr. Justice

Douglas in his dissent that "[t]o most, 'every person' would mean every person, not every person except judges." Pierson v. Ray, 336 U.S. at 559, 87 S.Ct. at 1220 (Douglas, J., dissenting). (Emphasis in original.)

But this, of course, does no more than show why plaintiffs in their complaint did not choose to sue the judge-defendants for money damages. The grant of certiorari in Pierson was "to consider whether a local judge is liable for damages under § 1983 for an unconstitutional conviction. . . ." Id. at 551, 87 S.Ct. at 1216. The Court did not consider the issue of immunity from injunctive or other equitable relief. Nor do either of the cases cited by the district court in its memorandum and order in the case before us[36] hold that the sort of relief requested by plaintiffs herein is barred.

The issue of whether or not injunctive relief may be granted under 42 U.S.C. § 1983 in an action against a state judge has been considered by only a

---

32. 361 F.2d at 586 n. 7.

33. This court has held a sitting judge liable for damages when he acted outside his duty. In Spires v. Bottorff, 317 F.2d 273 (7th Cir. 1963), an inmate of a state penitentiary sued a state judge alleging the judge, who had disqualified himself, had persuaded the warden of the penitentiary to try to prevent plaintiff from corresponding with the clerk of the state court regarding his previous conviction. The court held that these allegations stated a cause of action under the Civil Rights Act. Concerning the defense that, since the judge had disqualified himself, he was not acting "under color of state law," the court said,

"He did not, by disqualifying himself, become any less a judge and without the state authority he had, he could not have been as effective in interfering, as charged, with petitioner's right to an orderly and fair hearing. If the disqualification rendered him immune from overstepping his authority, 'the words "under color of any law" were hardly apt words to express the idea.' Screws v. United States, 325 U.S. 91, 111 [65 S.Ct. 1031, 89 L.Ed. 1495] (1944)." 317 F.2d at 274–275.

34. Subsequently on appeal to the County Court, a trial de novo was held as to one of the demonstrators and a directed verdict of acquittal was granted. The cases against the others were then dropped. 386 U.S. at 550, 87 S.Ct. 1213.

35. "We do not believe that this settled principle of law was abolished by § 1983, which makes liable 'every person' who under color of law deprives another person of his civil rights. The legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities. Accordingly, this Court held in Tenney v. Brandhove, 341 U.S. 367 [, 71 S.Ct. 783, 95 L.Ed. 1019] (1951), that the immunity of legislators for acts within the legislative role was not abolished. The immunity of judges for acts within the judicial role is equally well established, and we presume that Congress would have specifically so provided had it wished to abolish the doctrine." 386 U.S. at 554–555, 87 S.Ct. at 1218.

36. Brown v. Dunne, 409 F.2d 341 (7th Cir. 1969), and Jones v. Jones, 410 F.2d 365 (7th Cir. 1969), cert. denied, 396 U.S. 1013, 90 S.Ct. 547, 24 L.Ed.2d 505 (1970).

few courts. Significantly, in all the cases we have been able to find in which the court seriously considered this question, the gravamen of the offense was a discrimination by state judicial officers against a cognizable class—exactly the case alleged herein. In United States v. Clark, 249 F.Supp. 720 (S.D.Ala.1965), a three-judge court was faced with a claim for injunctive relief against attempts by local officials to interfere with the rights of Negroes to use public accommodations and to register to vote. The United States was the plaintiff pursuant to 42 U.S.C. §§ 1971, 2000a–(a), 2000a–5, seeking a decree which requested in part an injunction to prevent defendants from,

> "(a) Arresting, detaining under unreasonable bail, prosecuting, convicting, punishing, or threatening to arrest, detain, prosecute, convict or punish discriminatorily and without just cause any person who is known by defendants to be exercising, seeking to exercise, or to have exercised his right to vote or to use public accommodations free from racial discrimination;
>
> "(b) Requesting, issuing, enforcing, or threatening to enforce any injunction that prevents persons from effectively organizing, meeting or assembling to discuss or advocate the exercise of said rights . . . ." 249 F.Supp. at 722.

The various judicial and quasi-judicial defendants—two judges and the city solicitor—objected on the ground that they were immune from suit. After noting the importance of the doctrine of judicial immunity, the court went on to distinguish it:

> "However, such a doctrine of judicial immunity applies only when those officials are faced with civil suits for damages in connection with the performance of their official duties. The doctrine has no application where, as here, the relief is preventive. . . .
> The principle that no State official—regardless of his position—is immune from having his conduct challenged—in the form of a preventive action—is well established. Cooper v. Aaron, 358 U.S. 1, [78 S.Ct. 1401, 3 L.Ed. 2d 5]; Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, [84 S.Ct. 1459, 12 L.Ed. 2d 632]; Sterling v. Constantin, 287 U.S. 378, [53 S.Ct. 190, 77 L.Ed. 375]; Bush v. Orleans Parish School Board (E.D.La., 1960), 187 F.Supp. 42, aff'd 365 U.S. 569, [81 S.Ct. 754, 5 L.Ed.2d 806]; In re Wallace (M.D. Ala., 1959), 170 F.Supp. 63.
> ". . . Such an action involves no interference with judicial discretion since an injunction—if warranted by the evidence and if issued—will only prevent the doing of what there is no right to do. Ex parte Young, 209 U.S. 123, 159, 28 S.Ct. 441, 52 L.Ed. 714." 249 F.Supp. at 727–728. (Emphasis in original.) [37]

In a similar case involving intimidation of Negro citizens who wished to vote, Judge Wisdom, confronting the same sort of problem, drew the distinction between injunctive relief and damages:

> "In Pierson v. Ray, 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, the Supreme Court held that judges are immune from liability for *damages* in suits under 42 U.S.C. § 1983. The case does not, of course, mean that they may not be enjoined from pursuing a course of unlawful conduct." United States v. McLeod, 385 F.2d 734, 738 n. 3 (5th Cir. 1967). (Emphasis in original.)

See also Phillips v. Cole, 298 F.Supp. 1049 (N.D.Miss.1968), and Bramlett v.

---

37. It should be noted that the court did not issue an injunction against Judge Hare, Solicitor McLeod, or Judge Reynolds at that time, due to the considerations of comity and the fact that "the other relief that is to be afforded in this case will make it unnecessary" (249 F. Supp. at 729) to enjoin them. However, jurisdiction was retained over those defendants and thus the holding of the case was that the district court could issue such an injunction.

Peterson, 307 F.Supp. 1311 (M.D.Fla. 1969).[38]

In sum, those courts which have considered the issue have held that when a class-discrimination is alleged, judicial officers may be enjoined.[39] Nor is there any statutory block to such an injunction. Even if what plaintiffs request might fall within the rubric of 28 U.S. C. § 2283, which we doubt since they are not asking that any state court proceedings be "stayed," it is now clear that 42 U.S.C. § 1983 is a specific statutory exemption to the prohibition. Mitchum v. Foster, *supra*.

Mitchum also reaffirmed the teaching of Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746, 27 L.Ed.2d 669 (1971), as to the notions of comity and desire not to enjoin state court criminal prosecutions. Although not raised by defendents we feel a few comments are merited. Here there is a distinct allegation that plaintiffs are being subjected to unequal treatment by the judges because of their race and their civil rights activity. This is an existing, present violation of 42 U.S. C. § 1981, not just a potential violation. Moreover, plaintiffs have not sought to enjoin the state from prosecuting anyone, but merely to enjoin the judges from unconstitutionally fixing bail and sentences. Finally, one important consideration with respect to the irreparable injury suffered by plaintiffs' class in sentencing discrimination, the individual defendant in a criminal case finds it extremely difficult, if not impossible, to obtain review of his sentence as long as it is within the statutory limits. The standard of proof for

abuse is very severe. "[I]mposition of sentence is a matter of judicial discretion, and in the absence of a manifest abuse of that discretion it will not be altered by a reviewing court." People v. Bonner, 37 Ill.2d 553, 563, 229 N.E. 2d 527, 533 (1967), cert. denied, 392 U. S. 910, 88 S.Ct. 2067, 20 L.Ed.2d 1368 (1968).

But it is quite possible that a class of plaintiffs will be able to show an invidious discrimination in length of sentences imposed by a given judge, even though all of the sentences may fall within the statutory maximum. Although admittedly a difficult proposition for the plaintiffs to prove, we do not feel that proof is so improbable that the plaintiffs should be denied a chance to establish their allegations.[40] For the reasons expressed above, we consider that *Younger* does not control this sort of case, and if it does that the plaintiffs' allegations are sufficient to come within the "exceptional circumstances" test outlined therein:

"where irreparable injury is 'both great and immediate,' 401 U.S., at 46, [91 S.Ct. 746,] where the state law is 'flagrantly and patently violative of express constitutional prohibitions,' 401 U.S., at 53, [91 S.Ct. 746,] or where there is a showing of 'bad faith, harassment, or . . . other unusual circumstances that would call for equitable relief.' 401 U.S., at 54 [, 91 S.Ct. 746]." Mitchum v. Foster, *supra*, 407 U.S. at 230, 92 S.Ct. at 2156.

Since the immunity, often characterized as "quasi-judicial," cloaking the prosecuting attorney is, of necessity, derivative from the concepts developed in

---

38. The only case which seems to reject this distinction is Arensman v. Brown, 430 F.2d 190 (7th Cir. 1970), which will be considered with those cases discussing prosecutorial immunity, since that was the specific context in which it arose.

39. It should be noted that the Supreme Court in a recent construction of 42 U.S.C. § 1985(3), Griffin v. Breckenridge, *supra*, 403 U.S. at 102, 91 S.Ct. at 1798, stated, "The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort

law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment."

40. Similar difficult fact questions are placed before district judges in many different contexts, e. g., the proof of intent where it is appropriate to an offense charged. The fact that questions are difficult, and may require proof by inference, should not be a basis for dismissal.

connection with the judiciary, the conclusions we have reached in the parent. would seem to be dispositive of the offspring. Nevertheless, because of cases treating the matter from the viewpoint of the prosecuting attorney, we do separately address ourselves to that phase of the present case. An early mention of "quasi-judicial" immunity is found in Yaselli v. Goff, 12 F.2d 396 (2nd Cir. 1926), aff'd per curiam (mem.), 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927), an action brought against a special assistant to the Attorney General for malicious prosecution. The court chose to extend the immunity offered to judicial officers in the exercise of their duties to these quasi-judicial officers.[41]

Cases from this Circuit have uniformly held that an action for damages would not lie against a prosecutor who was performing his duties, no matter what malice was alleged. The earliest case in this Circuit considering the question is Cawley v. Warren, 216 F.2d 74 (7th Cir. 1954), in which plaintiff sued the state's attorney, his first assistant, and the foreman of a grand jury for allegedly wrongfully procuring indictments against him. The action was brought under 42 U.S.C. § 1985, and the court, without reference to the legislative history, or even any reference to the words of the statute, stated, "[t]he law sup-

ports this claim of immunity. It extends to and includes judges, prosecuting attorneys and members of a grand jury." 216 F.2d at 75.[42]

As noted in the first portion of this opinion, the legislative history of the various Civil Rights Acts makes a strong case for the view that Congress intended to hold prosecutors liable, even for damages, when they discriminated against classes of citizens. Be that as it may, this court has followed its opinion in *Cawley* in numerous other cases, e. g., Stift v. Lynch, 267 F.2d 237 (7th Cir. 1959), and Phillips v. Nash, 311 F.2d 513 (7th Cir. 1962), cert. denied, 374 U.S. 809, 83 S.Ct. 1700, 10 L.Ed.2d 1033 (1963) (a case which followed shortly after the Supreme Court had opened up the field of damage suits for deprivation of civil rights by reversing this Circuit in Monroe v. Pape, *supra*). Nor is this Circuit the only one to adopt such a rule. In fact every circuit which has considered the question seems to have reached the same result.[43]

In many of these cases the court reached this result in a summary manner. Our discussion of the relevant legislative history and the words of the statute themselves reflect our belief that there is not freedom from doubt on this issue. However, the Supreme Court's opinion in Pierson v. Ray, *supra*, must control. In essence, it seems that prose-

41. "A United States attorney, if not a judicial officer, is at least a quasi judicial officer, of the government. He exercises important judicial functions, and is engaged in the enforcement of the law. The reasons for granting immunity to judges, jurors, attorneys, and executive officers of the government apply to a public prosecutor in the performance of the duties which rest upon him." 12 F.2d at 404.

42. The court did add the following comment:
"While we can understand from the facts set forth in plaintiff's complaint her outraged feeling resulting from the charged acts of the defendants, the rule enunciated in the foregoing cases is that, as a matter of public policy, such an injured person is without relief in a civil proceeding." 216 F.2d at 76–77.

43. Fanale v. Sheehy, 385 F.2d 866 (2nd Cir. 1967); Dacey v. New York County Lawyers' Association, 423 F.2d 188 (2nd Cir. 1969), cert. denied, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970); Bauers v. Heisel, supra; United States ex rel. Rauch v. Deutsch, 456 F.2d 1301 (3rd Cir. 1972); Guedry v. Ford, 431 F.2d 660 (5th Cir. 1970); Madison v. Gerstein, 440 F.2d 338 (5th Cir. 1971); Hurlburt v. Graham, 323 F.2d 723 (6th Cir. 1963); Rhodes v. Meyer, 334 F.2d 709 (8th Cir. 1964), cert. denied, 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186; Clark v. State of Washington, 366 F.2d 678 (9th Cir. 1966); Ney v. State of California, 439 F.2d 1285 (9th Cir. 1971); Kostal v. Stoner, 292 F.2d 492 (10th Cir. 1961), cert. denied, 369 U.S. 868, 82 S.Ct. 1032, 8 L.Ed.2d 87 (1962).

cutors are closer to the judge in *Pierson* than to the policeman in Monroe v. Pape, *supra*. We therefore hold that insofar as defendant Berbling was acting within his prosecutorial function he has a quasi-judicial immunity from suit for damages under the Civil Rights Acts.

Two more issues remain with respect to Berbling and Shepherd: first, the scope of this quasi-judicial immunity, and, second, the availability of injunctive relief. Insofar as Berbling and Shepherd are not acting within the scope of prosecutorial discretion they are not covered by the above cases absolving them from liability for damages. The duties of the State's attorney are set out in the Illinois Revised Statutes, ch. 14, § 5 (1971).[44] They include:

"(1) To commence and prosecute all actions, suits, indictments and prosecutions, civil and criminal, in the circuit court for his county, in which the people of the State or county may be concerned."

Nowhere is there any mention of the State's attorney having as one of his "quasi-judicial" duties the investigation of crimes, which is primarily a police function. It has long been established that police officers have no immunity from civil liability under 42 U.S.C. § 1983, Monroe v. Pape, *supra*. It would be anomalous if the State's attorney's quasi-judicial immunity carried over to situations in which he was acting as a police investigator rather than in his quasi-judicial role.[45]

Two other circuits have considered this issue and have reached the same result. In Lewis v. Brautigam, 227 F.2d 124 (5th Cir. 1955), the state's attorney was alleged to have ordered deputies to force plaintiff to pose for photographs showing him in convict garb at a state prison and also to plead guilty. The court found it unnecessary to inquire into the

"nature of the quasi-judicial immunity further than to say that a quasi-judicial officer, such as a prosecuting attorney, who acts outside the scope of his jurisdiction and without authorization of law, cannot shelter himself from liability by the plea that he is acting under color of office." 227 F.2d at 129.

Similarly in Robichaud v. Ronan, 351 F.2d 533 (9th Cir. 1965), plaintiff alleged that the county attorney had directed certain police activity designed to coerce and intimidate her into making a confession. The court reversed the dismissal with some words that we find applicable to the present case:

"We believe, however, that when a prosecuting attorney acts in some capacity other than his quasi-judicial capacity, then the reason for his immunity—integral relationship between his acts and the judicial process—ceases to exist. If he acts in the role of a policeman, then why should he not be liable, as is the policeman, if, in so acting, he has deprived the plaintiff of rights, privileges, or immunities secured by the Federal Constitution and laws? . . .

"The title of office, quasi-judicial or even judicial, does not, of itself, immunize the officer from responsibility for unlawful acts which cannot be said to constitute an integral part of judicial process." 351 F.2d at 536, 537–538.

The court did not attempt to distinguish which acts might have been committed after the county attorney had abandoned his quasi-judicial role, but remanded to the district court to make such a determination.

In the case before us, the allegations in the complaint may not be sufficiently removed from judicial (or quasi-judicial) activity, such as evaluation for prosecutorial purposes, to warrant removing

---

44. This section was amended effective August 24, 1971, by P.A. 77–1244, § 1, but the change was immaterial, dealing only with form and so the citation is to the current law.

45. For a case holding a judge liable for acts outside his judicial duties, see Spires v. Bottorff, 317 F.2d 273 (7th Cir. 1963), discussed above at n. 33.

the cloak of immunity from them, but this was not considered by the district court. The better course therefore is to remand to allow plaintiffs to clarify their complaint by amendment and give the district court a chance to reconsider in the light of the views expressed herein.

The second unanswered question is whether the State's attorney is subject to injunctive proscription. Since Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), it has been clear that a federal court has the power to enjoin a state prosecutor from instituting criminal proceedings under a state statute. Even earlier than *Young*, lower courts had recognized that such a power existed. M. Schandler Bottling Co. v. Welch, 42 F. 561 (C.C.Kan.1890). Moreover, in Mitchum v. Foster, *supra*, the Supreme Court has recently affirmed that 42 U.S.C. § 1983 is an express statutory exception to 28 U.S.C. § 2283.

■ In light of the above cases, we come to the case of Arensman v. Brown, 430 F.2d 190 (7th Cir. 1970), in which the court held that quasi-judicial immunity forbids a request for an injunction against a prosecutor from prosecuting a criminal cause of action against the plaintiff. We read *Arensman* as being confined to its facts, noting that the court stated "we think the case borders on the frivolous," 430 F.2d at 191. Also there was no allegation that plaintiff's rights could not be adequately vindicated at a criminal proceeding nor any other allegation that might exclude it from the guidelines set down in Younger v. Harris, *supra*. We hold that the quasi-judicial immunity does not extend to complete freedom from injunction.

Although defendants did not raise the issue in their brief, we find it necessary to treat the consideration raised in Peek v. Mitchell, 419 F.2d 575 (6th Cir. 1970), where the court denied a similar affirmative injunction to require prosecution. That case highlights the difference between an injunction forbidding prosecution and one compelling prosecution, which are admittedly based on different considerations. In *Peek*, plaintiffs sought to compel federal and state officials to prosecute two Detroit policemen who allegedly committed violations of plaintiffs' civil rights during the Poor People's Campaign on May 13, 1968. Initially the court rejected the contention that defendants had a total immunity from injunction, but added,

> "It is likewise apparent that the federal courts must achieve a balance between the protection of individual rights and the freedom of public officials to exercise their necessary expertise in performing their duties. This is an era of increased litigation involving alleged civil rights violations, and the courts must shield the responsible public officials against any abusive use of the civil rights legislation." 419 F.2d at 578.

In denying injunctive relief, the court rejected the plaintiffs' contention that there was a " 'systematic pattern' of conduct," and held

> "We find that based on this record, the Prosecuting Attorney is immune from the types of relief sought here. . . . Defendant's statutorily imposed obligations, which include investigation, were performed in the good-faith exercise of his discretion as prosecuting attorney and within the scope of his authority. *We find no arbitrary or discriminatory action which would prompt substitution of our judgment for his.*" 419 F.2d at 578–579. (Citation omitted. Emphasis added.)

Similarly, it was recently stated, "It is hardly necessary to add that the doctrine of prosecutorial discretion has never insulated conduct from review on charges of bad faith, fraud, or illegality." Boyd v. United States, 345 F.Supp. 790, 793 (E.D.N.Y.1972).

■ Plaintiffs in the present case have alleged that prerequisite for injunctive relief which the Sixth Circuit in *Peek* found lacking. Plaintiffs have alleged that the State's attorney handles complaints and prosecutes cases in a bla-

tantly discriminatory and arbitrary manner.[46]

 This is not a case in which it can be said that there is an adequate remedy at law and therefore there is no proper basis for equitable relief. Theoretically, plaintiffs now have an action for damages under 42 U.S.C. § 1985(3) against the private parties who have been assaulting them.[47] We, however, would retund credulity to say that a private action of that sort is the equivalent of prompt and effective prosecution under the criminal laws. At least one of the principal reasons for criminal laws is their deterrent effect on similar conduct by others. While, in some instances, the private damage action may have deterring effects, it seems unlikely it will obviate the necessity for a system of criminal justice. The type of discriminatory conduct here alleged will not be, in our opinion, deterred by the possibility of piecemeal after-the-fact damage suits.

We conclude that plaintiffs' remedy at law is plainly inadequate and equitable relief is proper. In addition, the above consideration shows the "great and immediate" irreparable injury being suffered by plaintiffs to justify intervention under Younger v. Harris, supra, 401 U.S. at 46, 91 S.Ct. 746.

 As to defendants' repeated references to the fact that we are dealing with an area of discretion, we need only note the words of Chief Justice Marshall:

"Courts are the mere instruments of the law, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when

that is discerned, it is the *duty* of the court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the legislature; or, in other words, to the will of the law." Osborn v. Bank of the United States, et al., 9 Wheat. (22 U.S.) 738, 866, 6 L.Ed. 204 (1824). (Emphasis added.)

The word discretion is limited by the duty to follow the law and such a blanket pattern of discrimination as is here alleged cannot be said to conform to such a duty. A discretionary action is subject to review and reversal for abuse of discretion. "And by abuse of discretion is meant action which is arbitrary, fanciful, or clearly unreasonable." United States v. McWilliams, 82 U.S.App.D.C. 259, 163 F.2d 695, 697 (1947). For us to find that the acts and failures to act alleged in the complaint do not constitute an abuse of discretion, we would have to say that they do not constitute "arbitrary action," Burns v. United States, 287 U.S. 216, 223, 53 S.Ct. 154, 77 L.Ed. 266 (1932), and this we can only do by ignoring the mandates of equal protection of the laws.

 The principal reasons presented for various types of immunity have been capably summarized:

"(1) the danger of influencing public officials by threat of a law suit; (2) the deterrent effect of potential liability on men who are considering entering public life; (3) the drain on the valuable time of the official caused by insubstantial suits; (4) the unfairness of subjecting officials to liability for the acts of their subordinates; (5) the theory that the official

---

46. That the prosecutor's power is great was recognized over 40 years ago by the Wickersham Commission:
 "The prosecutor [is] the real arbiter of what laws shall be enforced and against whom, while the attention of the public is drawn rather to the small percentage of offenders who go through the courts." National Commission on

Law Observance and Enforcement: No. 4, Report on Prosecution, p. 19 (1931), quoted in Kaplan, The Prosecutorial Discretion—A Comment, 60 Nw.U.L. Rev. 174, 175 (1965).

47. Since Griffin v. Breckenridge, *supra*, overruled Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951).

owes a duty to the public and not to the individual; (6) the feeling that the ballot and the formal removal proceeding are more appropriate ways to enforce the honesty and efficiency of public officers." Note, The Proper Scope of the Civil Rights Acts, 66 Harv.L.Rev. 1285, 1295 n. 54 (1953). Numbers (1), (2) and (4) would seem to apply only to civil actions for damages and not to injunctive relief which we have approved herein. Reason number (3) is a serious consideration—a prosecutor's time is necessarily limited—but since we approve not a case brought by a single disappointed complainant, but rather one brought by an entire class of citizens of Cairo, Illinois, the number of such suits charging discrimination against classes of citizens is not predictably substantial nor is their merit predictably insubstantial. Moreover, as to both (3) and (5) the duty owed to the public is primary and that duty is an even-handed, nondiscriminatory enforcement of the laws, not a vindication of an individual's complaint; it is that public duty which plaintiffs seek to enforce. Finally, as to (6), defendants have not argued, either before this court or in the district court, that there is a requirement of exhaustion of state legal or political remedies, an argument which we would reject in the light of Carter v. Stanton, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972), no matter how potentially adequate those remedies might appear to be.

Nor could we find such political remedies adequate. Cairo, Illinois, has admittedly been the scene of substantial civil rights agitation for the last several years. Not surprisingly there has been a polarization of the community, and, in such a case, it would be totally presumptuous of this court to find that the ballot provides even a probability of remedying the alleged oppression of the minority by the duly elected representatives of the majority. It was, in fact, just such oppression which caused the Congress to enact the provisions with which we now deal.[48] In summary, considering all of the generally accepted reasons for granting immunity to state officials, we conclude that none is applicable here, especially in light of the corrosive impact the alleged conduct has had on the equal handed application of the criminal justice system.

Nor do we find various alternative remedies sufficiently useful for us to deny the relief sought by plaintiffs. As to any direct remedy by criminal prosecution for official misconduct by the defendants, suggested by, e. g., Note, Nonfeasance: A Threat to the Prosecutors' Discretion, 30 Ind.L.J. 74 (1954), we think the following correctly puts the matter:

"Such remedies are merely nominal. The criminal sanctions can rarely be invoked to control the errant police officer, the errant prosecutor, and never the oppressive judge. The civil damage suit is worthless, especially if the victim of oppression is a social misfit or an unsavory character." Breitel, Controls in Criminal Law Enforcement, 27 U.Chi.L.Rev. 427, 434 (1960).

Nor is there any possibility of private enforcement of criminal laws [49] since Illinois has not provided for such actions by statute.[50]

48. See discussion of legislative history, *supra*, especially pp. 399–401.

49. "A system of private prosecution can be justified in terms of both society's interest in increased law enforcement and the individual's interest in vindication of personal grievances. Full participation by the citizen as a private prosecutor is needed to cope with the serious threat to society posed by the district attorney's improper action and inaction. This rationale alone is adequate to support private prosecution." Comment, Private Prosecution: A Remedy for District Attorneys' Unwarranted Inaction, 65 Yale L.J. 209, 227 (1955).

50. Although private prosecutors may assist the State's attorney, the Illinois Supreme Court has stated "the State's attorney, as a public officer, must have the direction and assume the responsibility of the prosecution. It would be manifestly improper to permit counsel paid by private parties to supplant the

Finally, we need only note the potentially egregious results of denying relief in this case if the allegations are true. The Constitution prescribes through the Fourteenth Amendment that the states must apply their laws equally. This view was adopted by the Supreme Court in Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886):

> "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."

Few courts have applied *Yick Wo* to substantial criminal prosecutions, perhaps because of a failure of proof by various criminal defendants of such invidious discrimination and perhaps from a desire by courts to avoid freeing criminals. Yet, "when the claim of discriminatory enforcement is raised in an injunction proceeding, it is not as obvious that recognition of the claim will result in freeing a possible criminal, since an injunction can be limited to enjoin only discriminatory enforcement rather than all enforcement." Comment, The Right to Nondiscriminatory Enforcement of State Penal Laws, 61 Colum.L.Rev. 1103, 1109 n. 25 (1961). We feel that the injunctive remedy proposed by plaintiffs if their case be proved on hearing must be found preferable to a holding that the criminal laws cannot be enforced against blacks who assault whites so long as whites are not being punished for assaults on blacks.

Moreover, considering the lack of alternative remedies, if the federal courts should say to these plaintiffs, after having stripped the Civil Rights Acts of

their damage remedy by invoking the concept of judicial immunity, that there is no injunctive relief available, then our system of government of law and not of men will be subject to question. As Judge Cummings said in Stamler v. Willis, 415 F.2d 1365, 1369–1370 (7th Cir. 1969), "[t]he judiciary has always borne the basic responsibility for protecting individuals against unconstitutional invasions of their rights by all branches of Government."

■ Our focus has been primarily on the judicial immunity of the judge defendants and the quasi-judicial immunity of the State's attorney defendant. It obviously follows from what we have said that Shepherd, the investigator, would not be entitled to immunity in any event from injunction and, in all probability, not from a civil rights action for damages. While the district court spread Berbling's supposed mantle around Shepherd, we note that the investigator from the complaint might seem to border more in the nature of a policeman-detective than one entitled to the protective quasi-judicial immunity from damage actions. We do not need to decide this issue now as the proof on a trial should establish his status with greater exactitude than we are able to do on the record before us.

■ Obviously, since this case is before us on a motion to dismiss, it would be improper for us to attempt to spell out in detail any relief the district court might grant if the plaintiffs can prove what they allege.[51] Nevertheless, as this appears to be a case of first impression as to the type of relief approved, we feel obligated to give the district court some guidelines as to what type of remedy might be imposed. We do not mean to require the district court to sit in constant, day-to-day supervision of either state court judges or the State's attorney. An initial decree might set out the

constituted officer of the law and to assume the management of the case. . . ." Hayner v. People, 213 Ill. 142, 147, 72 N.E. 792, 794 (1904).

51. For examples of the way in which such proof might be made see Comment, *supra*, 61 Colum.L.Rev. at 1122–1131.

general tone of rights to be protected and require only periodic reports of various types of aggregate data on actions on bail and sentencing and dispositions of complaints. Nevertheless, we have complete confidence in the district court's ability to set up further guides as required [52] and if necessary to consider individual decisions.[53] Difficulty of formulating a remedy if a complaint is proved following a trial cannot be grounds for dismissing the complaint *ab initio*. We cannot so easily belittle the powers of a court of equity nor the ability of district judges who have grappled with difficult remedies before, *e. g.*, school desegregation orders, railroad reorganizations.

We also are not unmindful of the possibility of a substantial additional burden being placed on the federal judiciary by our decision. However, if it can be alleged and proved, and the sweep of our decision is to be no broader, that the state officials consistently, designedly and egregiously have, under color of law, deprived an entire group of citizens of their civil rights, then the additional burden will necessarily have to be assumed. The civil rights of all persons, too often merely words in a constitutionally inspired century-old statute, deserve no lesser implementation than here accorded them.

Further, in response to the final rhetoric of the dissent, we reemphasize that we have no intent of suggesting that the allegations of the complaint are true. Certainly we have not intended any intimation that corruption exists on the part of the accused officials. We have only said that if the allegations are true, and the burden of proving truth is on the plaintiffs, then a federal cause of action has been stated.

For the reasons set out hereinbefore, we reverse and remand for further proceedings not inconsistent herewith. The case shall be reassigned to a different district judge.

Reversed and remanded.

DILLIN, District Judge (dissenting).

The majority holds, for the first time, that a federal district court has the power to supervise and to regulate by mandatory injunction the discretion which state court judges and state's attorneys may exercise within the limits of the powers vested in them by law. I respectfully suggest that no such power exists.

It is true, as a generality, that the immunity doctrine which protects such judicial and quasi-judicial officials against damage actions does not preclude the granting of equitable relief against them. Jacobson v. Schaefer, 441 F.2d 127 (7 Cir. 1971). However, in the cases cited by the majority [1] in which this doctrine has been applied, the equitable relief granted has invariably been in the form of a prohibitory injunction, confining such officials to the limits of their legal authority. There is a great difference between ordering an official not to do a particular act, measurable by objective standards, and in ordering him to exercise his discretion in a certain general way, measurable only by subjective standards.

Many pages of the majority opinion are devoted to an argument, derived from the legislative history of the Civil Rights Acts, to the effect that it was the congressional purpose that there should be no exceptions to the apparently

---

52. *E. g.*, Abrams, Internal Policy: Guiding the Exercise of Prosecutorial Discretion, 19 U.C.L.A.L.Rev. 1 (1971).

53. *Id.* at 45–49 discussing Regina v. Commissioner of Police ex rel. Blackburn, [1968] 1 Q.B. 118.

1. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) ; United States v. McLeod, 385 F.2d 734 (5 Cir. 1967) ;

United States v. Clark, 249 F.Supp. 720 (S.D.Ala.1965) ; Phillips v. Cole, 298 F.Supp. 1049 (N.D.Miss.1968) ; Bramlett v. Peterson, 307 F.Supp. 1311 (M.D. Fla.1969). Cf. Dombroski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) ; Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) ; Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676 (1880).

all inclusive wording of those Acts. However much I might agree if this case were the first to interpret that legislation, the fact remains that those same arguments have been eloquently expressed and the same history reviewed by Mr. Justice Douglas in his dissenting opinions in cases similar to ours, and have been found wanting. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); City of Greenwood v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L. Ed.2d 944 (1966).

Greenwood v. Peacock, *supra*, is particularly instructive here. That case involved the question of whether another of the Civil Rights Acts, 28 U.S.C. § 1443(1),[2] permits removal of a criminal case from state to federal court when a state statute, although valid and non-discriminatory on its face, is applied in a discriminatory fashion, for racial reasons, in violation of the equal rights of the accused. The Fifth Circuit held in the affirmative,[3] in disregard of a long line of cases beginning with Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880), and ending with Kentucky v. Powers, 201 U.S. 1, 26 S.Ct. 387, 50 L.Ed. 633 (1906). The Fifth Circuit was reversed, the Court holding with reference to such previous cases, after considering the question anew, as follows:

"Those cases all stand for at least one basic proposition: It is *not* enough to support removal under § 1443(1) to allege or show that the defendant's federal equal civil rights have been illegally and corruptly denied by state administrative officials in advance of trial, that the charges against the defendant are false, or that the defendant is unable to obtain a fair trial in a particular state court. The motives of the officers bringing the charges may be corrupt, but that does not show

that the state trial court will find the defendant guilty if he is innocent, or that in any other manner the defendant will be 'denied or cannot enforce in the courts' of the State any right under a federal law providing for equal civil rights. The civil rights removal statute does not require and does not permit the judges of the federal courts to put their brethren of the state judiciary on trial. Under § 1443 (1), the vindication of defendant's federal rights is left to the state courts except in the rare situations where it can be clearly predicted by reason of the operation of a pervasive and explicit state or federal law that those rights will inevitably be denied by the very act of bringing the defendant to trial in the state court. [State of] Georgia v. Rachel, 384 U.S. 780, [86 S. Ct. 1783, 16 L.Ed.2d 925]; Strauder v. [State of] West Virginia, 100 U.S. 303 [, 25 L.Ed. 664]." 384 U.S. at 827–828, 86 S.Ct. at 1812.

The situation presented in *Greenwood* and the situation alleged in the complaint here are, for all practical purposes, identical. In that case it was alleged, as a basis for removal of criminal actions brought against black defendants in a state court, that the local officialdom was applying statutes, valid on their face, in a racially discriminatory manner to deny defendants of their civil rights. In this case, the same kind of discriminatory conduct is alleged: that the officials apply the criminal laws harshly to blacks, and lightly, if at all, to whites. In *Greenwood*, recognition of the right to remove under the circumstances outlined would have required the federal district court, in each instance where removal had been taken and a petition for remand filed, to conduct an evidentiary hearing to determine wheth-

---

2. § 1443. "Any of the following civil actions or criminal prosecutions commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending: (1) Against any person who is denied or cannot enforce in

the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof; . . . ."

3. Peacock v. City of Greenwood, 347 F.2d 679 (5 Cir., 1965).

er a pattern of discrimination existed. In addition to placing an intolerable burden upon the federal courts, such an interpretation of § 1443(1), it was said, would have operated to work a wholesale dislocation of the historic relationship between the state and federal courts in the administration of criminal law. Such was not the intent of the Congress, the majority concluded.

If, as the Court said in *Greenwood*, it was not the intent of Congress that § 1443(1) be applied as contended by the State court defendants, *a fortiori* it could not have been intended that "a wholesale dislocation of the historic relationship between the state and federal courts in the administration of criminal law" be accomplished by enabling federal trial courts to "put their brethren of the state judiciary on trial," as the majority would do in cases such as the one before us.

In the *Greenwood* situation, had the Court ruled the other way, the duties of the federal trial court would be at an end once it had concluded the required hearing. The Court would either find no pattern of discrimination, and remand the case, or it would find such a pattern and either dismiss or try the case, as the circumstances warranted. In the case at hand, however, the federal court's task would be never ending, assuming that plaintiffs could make their case. The court would first need to conduct an evidentiary hearing to determine whether a pattern of discrimination could indeed be discerned; if so, it would presumably order the state's attorney to cease discriminating. Within the context of the complaint, this would mean not only that he should not ask for disproportionately high penalties against blacks, but that he should do a more vigorous job of investigating and filing charges made by blacks against whites, and try harder to obtain convictions in such cases as might be filed. Enforcement would necessarily be by contempt proceedings, which would require continuing hearings ad infinitum to examine the subjective motivation of the state's attorney in performing, or in allegedly failing to perform, his discretionary duties. For example, if the charge was made, and found to be true, that he failed to do his best to convict a white, who was acquitted, the defendant would remain free for double jeopardy reasons, but the prosecutor would go to jail. Similarly, a judge operating under a nebulous order not to discriminate in fixing bonds and in sentencing would thereafter be confronted with the possibility of a contempt citation and the necessity to defend his motivation in each instance when he performed either function to the dissatisfaction of a minority race defendant.

Nor is this the only difficulty with the majority's position. The principal complaint against the state's attorney is that he will not prosecute whites: therefore, he should be compelled to do so. But it was held in the Confiscation Cases, 74 U.S. (7 Wall) 454, 19 L.Ed. 196 (1868), that whether or not prosecution is to be instituted, or whether a *nolle prosequi* is to be filed in a pending action, is wholly within the discretion of the official in the executive branch of the government cloaked with such power. The functions of prosecutor and judge are incompatible, and the right in the executive branch to prosecute or not to prosecute is not subject to control by judicial discretion. Ex parte United States, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283 (1932); United States v. Thompson, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333 (1920); Peek v. Mitchell, 419 F.2d 575 (6 Cir. 1970); United States v. Cox, 342 F.2d 167 (5 Cir. 1965), cert. den. Cox v. Hauberg, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700; Powell v. Katzenbach, 123 U.S.App. D.C. 250, 359 F.2d 234 (1965), cert. den. 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359 (1966); Goldberg v. Hoffman, 225 F.2d 463 (7 Cir. 1955); United States v. Brokaw, 60 F.Supp. 100 (S.D.Ill.1945). Cf. Clark v. State of Washington, 366 F.2d 678 (9 Cir. 1966).

Upon the analogy to *Greenwood*, the additional reasons just stated, as well as upon application of the principles of "Our Federalism," as expounded in Younger v. Harris, 401 U.S. 37, 91 S.Ct.

746, 27 L.Ed.2d 669 (1971), and its companion cases,[4] I would affirm dismissal of the injunctive claims, claims one and six of the amended complaint, for failure to state a claim upon which relief could be granted. Rule 12(b)(6), Federal Rules of Civil Procedure.

I likewise disagree with the majority's action in reversing dismissal of the damage claims asserted against the state's attorney and his investigator in claims two, three, and four. The majority rather grudgingly concedes that all federal courts, including this one, hold that the immunity doctrine protects state's attorneys from damage actions arising out of the discharge of official duties, but suggests, without deciding, that perhaps investigation of charges of crime may not be a prosecutorial function and, again perhaps, some liability might lie in this area if only plaintiffs would redraft their complaint to plead something actionable.

First of all, I think that the amended complaint must stand or fall as drafted, particularly since the majority has elected to treat the lower court's dismissal as one for failure to state facts. The pleading, although lengthy, does not contain the rambling gibberish typical of a pro se complaint—a situation which frequently causes courts of review to search carefully for an actionable theory, inexpertly expressed—but to the contrary is expertly drafted by counsel who are obviously quite competent. The question, therefore, is as to whether the amended complaint states any facts at all upon which relief could be granted, and having to do with investigation. I find none.

The charge is not that the prosecutor and his investigator have overinvestigated—have applied undue pressure to obtain convictions of blacks, or have otherwise overreached, as in the two cases cited by the majority.[5] Rather, the charge is that they have not done enough in that they have *failed* to investigate charges by blacks against whites, and have *failed* to permit the filing of certain complaints. In other words, the charge is of nonfeasance or misfeasance in the discharge of the prosecutor's official duty to "commence and prosecute all actions . . . in which the people of the State or county may be concerned." [6]

Thus, as a matter of logic, we are down to this: if investigation is a function of the state's attorney's office, then the complaint must fail because of the immunity doctrine. If it is not, then the complaint is equally bad, since the state's attorney can hardly be held liable for *failure* to perform a task he is not required to do. Finally, it has been expressly held that failure to investigate alleged criminal conduct is clearly privileged as in the exercise of official, quasi-judicial functions. Scolnick v. Winston, 219 F.Supp. 836 (S.D.N.Y. 1963), aff'd 329 F.2d 716 (2 Cir. 1964). The amended complaint alleges no more against the investigator than against his superior, and must fail for the same reasons.

The rationale for the rule of immunity from damage actions was well expressed by Judge Learned Hand in Gregoire v. Biddle, 177 F.2d 579 (2 Cir. 1949), as follows:

"It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it

4. Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688; Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696; Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701; Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781; Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792.

5. Robichaud v. Ronan, 351 F.2d 533 (9 Cir. 1965); Lewis v. Brautigam, 227 F.2d 124 (5 Cir. 1955).

6. Ill.Rev.Stat. 1971, Ch. 14, § 5, as amended.

were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. . . . As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. . . .

"The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him. . . ." 177 F.2d at 581.

I submit that the reason for the rule against damage actions applies with equal force to mandatory injunctions which seek to regulate the exercise of discretion of judicial [7] and quasi-judicial officers. It would be cold comfort for

such an official to be told by this Court: "Be of good cheer! We will protect your pocketbook, even as we send you to jail."

I would affirm the judgment of the lower court in its entirety.

---

7. If corruption indeed exists in the Illinois judiciary, then that State should clean its own house. Ample procedures exist for accomplishing this end, which

can be set in motion by concerned citizens such as plaintiffs. Constitution of Illinois (1970), Art. 6, § 15.